**MDCM HOLDINGS, INC., On Behalf Of Itself and Others Similarly Situated, Plaintiff,**

v.

**CREDIT SUISSE FIRST BOSTON CORPORATION, Defendant.**

**No. 01 Civ. 9333(SAS).**

United States District Court, S.D. New York.

June 25, 2002.

Steven J. Toll, Linda P. Nussbaum, Susan R. Schwaiger, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York City, H. Laddie Montague, Jr., Charles Pearsall Goodwin, Philadelphia, PA, for Plaintiff.

Robert B. McCaw, Fraser L. Hunter, Jr., Wilmer, Cutler & Pickering, New York City, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

This is a class action brought against Credit Suisse First Boston Corporation ("Credit Suisse" or "CSFB") on behalf of internet-related and high technology companies that hired Credit Suisse to underwrite their initial public offering of stock ("IPO"). Plaintiffs' four causes of action are state law claims related to underwriting contracts that they entered into with Credit Suisse. Three of these claims assert that Credit Suisse breached the expressed terms of the contracts as well as the implied covenants and the fiduciary duties arising under those contracts. *See* 2/4/02 Amended Complaint ("Am.Compl.") ¶¶ 32–55. The fourth claim alleges unjust enrichment. *See id.* ¶¶ 56–61.

Credit Suisse now moves to dismiss the Complaint in its entirety or in part. *See infra* Part III.C. For the reasons discussed below, this motion is denied.

### II. JURISDICTION AND PROCEDURAL BACKGROUND

This Court has jurisdiction over the complaint because there is diversity of citizenship between the parties. *See* Am. Compl. ¶ 4 (citing 28 U.S.C. § 1332). Plaintiff MDCM Holdings, Inc. ("MDCM") is a Florida corporation with its principal place of business in Florida. *See id.* ¶ 6. Defendant Credit Suisse is a Massachusetts corporation with its principal executive office in New York. *See id.* ¶ 7. Credit Suisse's Technology Group, which participated in the IPOs of the putative class

members, has its headquarters in San Francisco, California. *See id.* The Complaint seeks relief only under New York state law, as required by the underwriting contracts. *See id.* ¶ 33.

The original Complaint was filed on May 25, 2001, in the Southern District of Florida. On October 5, 2001, Credit Suisse and MDCM presented the Florida district court with a joint stipulation seeking a transfer to this Court. That transfer was ordered on October 10, 2001. Venue is proper in this district because Credit Suisse maintains its principal place of business in the Southern District of New York, and a substantial part of the events giving rise to the plaintiffs' claims occurred here. *See* 28 U.S.C. § 1391(a), (c).

### II. LEGAL STANDARD

Under the Federal Rules of Civil Procedure, plaintiffs need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.*

Thus, when deciding a motion to dismiss, courts "must accept as true all of the factual allegations contained in the complaint." *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Indeed, courts have long been required to follow "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it

appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99.

## III. BACKGROUND

### A. Allegations

Out of a desire to raise new capital, corporations often decide to sell ownership of the company to the public by issuing stock. The first step in this process requires a company to find an investment bank that will agree to underwrite its IPO.[1] Agreements between the company issuing the stock ("issuer") and the investment bank underwriting the IPO ("underwriter") are executed in a contract commonly referred to as an underwriting agreement.

As with most contracts between sophisticated parties, representatives of the company and the investment bank discuss many topics before signing on the bottom line. The parties generally negotiate the amount of capital that the company seeks to raise, the type of security to be issued, the price and any special features of the security, and the underwriter's compensa-tion.[2] For example, the contract may "obligate the underwriter to acquire the IPO securities from the issuer at a [discounted] fixed price, and then resell the IPO securities to the public in accordance with the terms, and at a fixed offering price." Am. Compl. ¶ 15. The difference between these two prices is typically 7% of the IPO proceeds. *See id.* ¶ 19. The investment bank's profit in selling the issuer's stock to the public is intended to serve as compensation for its services. *See id.*

Mortgage.com, a company that specialized in providing online mortgage services, was one of the many internet-related and high technology companies that went public in the late 1990s. In July 1999, Mortgage.com's Board of Directors authorized the corporation to enter into an underwriting agreement with Credit Suisse, one of the nation's leading underwriters.[3] *See* Am. Compl. ¶¶ 14, 18, 25. On August 11, 1999, Mortgage.com and Credit Suisse executed the underwriting agreement. *See* 8/11/99 Underwriting Agreement at 1–17, attached as Ex. 1 to Appendix of Supplemental Materials provided by MDCM Holdings, Inc., at 1–17. The same day,

---

1. *See generally* National Association of Securities Dealers, *Going Public on the U.S. Securities Market* available at www.nasdaq.com/about/going_public.stm.

2. Underwriting agreements generally fall into two categories. "In so-called 'firm commitment' IPOs such as the Plaintiff's [sic] herein, the [investment bank] purchases the IPO [] securities directly from the issuer, and markets and resells the securities to investors." Am. Compl. ¶ 18. Even if the investment bank fails to resell the amounts of securities it purchased, it must still pay the agreed upon sum of money to the corporation. The second type of agreement is known as a "best efforts" agreement. In this type of agreement, the investment bank agrees to sell the securities for the corporation but does not guarantee the amount of capital raised by the issue. Thus, the issuer bears the risk that not all of the stock will be sold.

3. Indeed, "[b]etween 1999 and 2000, CSFB handled more high technology offerings than any other underwriter." Peter J. Beshar, "The New Wave of Securities Litigation—The 'Laddering Cases,'" in *How to Prepare an Initial Public Offering 2001* 343, 346 (Practising Law Institute Corporate Law and Practice Course Handbook Series No. B0–01BW, 2001). "As reported in *The Washington Post* on March 15, 2001, CSFB 'pocketed more than $500 million in underwriting fees for Internet companies.' That article also noted that 'over the past two years, technology underwriting as a whole brought in close to $1 billion for [CSFB].'" Am. Compl. ¶ 21 (quoting Michael C. Perkins and Celia Nunez, "Why Markets Don't Feel Your Pain," *Wash. Post*, March 15, 2001, at A25).

shares in Mortgage.com were issued to the public and began trading on the NASDAQ National Market under the ticker symbol "MDCM". Am. Compl. ¶ 25.

Pursuant to the underwriting agreement, Mortgage.com sold 7,062,500 shares of common stock to Credit Suisse for $7.44 per share, exactly 7% less than the public offering price of $8.00 per share. *See id.* In addition, Credit Suisse exercised an option under the underwriting agreement and acquired 379,375 additional shares for the same price. *See id.* As a result, Mortgage.com's IPO generated gross proceeds of approximately $59.5 million. *See id.* The compensation for Credit Suisse's service was $4,167,450. *See id.*

Two weeks after the IPO, Mortage.com's stock had almost doubled in value. *See id.* ¶ 26. On August 26, the stock price hit $22–3/4 per share, closing at $15–3/8 per share. *See id.* Such an increase was not unusual during the late 1990s: Mortgage.com was one of many issuers whose shares dramatically increased in value after being issued to the public. *See id.* ¶ 22. "In 1998 and 1999," for example, "the value of IPO shares frequently surged 400–500% during the first day of trading." Andres Rueda, "The Hot IPO Phenomenon and the Great Internet Bust," 7 *Fordham J. Corp. & Fin. L.* 21, 23 (2001). "Indeed, data published by Professor Jay Ritter of the University of Florida notes that the 10 biggest first-day IPO percentage increases in history all took place within the Class Period herein." [4] Am. Compl. ¶ 28.

The complaint alleges that Credit Suisse used this phenomenon to enrich itself by requiring that customers who wanted to purchase IPO shares pay it the prospectus price plus, directly or indirectly, a share of profits that the customers realized.[5] *See id.* ¶¶ 37, 40. Credit Suisse's actual compensation was thus far greater than the amount agreed upon by the issuers in the underwriting agreements. *See id.* ¶¶ 30, 37, 40. Moreover, the Complaint asserts that Credit Suisse purposefully underpriced certain securities in order to guarantee that those shares would rise in value once issued to the public. *See id.* ¶¶ 22–24. From the issuers' perspective, there was "money left on the table" because of this underpricing. *Id.* ¶ 22. For example, if Mortgage.com's original offering price had been somewhere between the high and low price of August 26, 1999, the company would have realized additional gross proceeds of $54 million to $109 million. *See id.* ¶ 25.

## B. MDCM's Class Action

On May 25, 2001, the corporation formerly known as Mortgage.com, now called MDCM Holdings, Inc.,[6] sued Credit Suisse on behalf of issuers that had used the investment bank to underwrite their IPOs from January 1, 1998, to October 31, 2000.

---

**4.** For detailed information on IPOs, *see generally* http://bear.cba.ufl.edu/ritter/ipodata.htm (website of Jay Ritter, Cordell Professor of Finance, University of Florida).

**5.** "These payments frequently took the form of direct sharing in their clients' profits who quickly sold (or 'flipped') the particular IPO stock at issue to other investors in the aftermarket...." Am. Compl. ¶ 29. Indirect payments were received through "increased or excessive trading commissions paid by the favored clients in connection with the IPO stock and/or on other securities transactions;

commitments for future IPO and/or other new securities trading business; and other similar arrangements." *Id.*

**6.** Like many other internet and high technology companies of the late 1990s, Mortgage.com was not successful and eventually ceased operations. *See* Am. Compl. ¶ 6. MDCM is the successor in interest to Mortgage.com and has assigned its assets to Lewis B. Freeman for the benefit of creditors, pursuant to Chapter 727 of the Florida Statutes. *See id.*

*See* Am. Compl. ¶ 1. The putative class is limited to companies whose securities "increased in value 15% or more above their original offering price within 30 days following the IPO."[7] *Id.* ¶ 1.

Count I of the Complaint alleges that Credit Suisse breached the explicit terms of the underwriting agreements in two ways. *First,* Credit Suisse did not sell the IPO shares to the public as the contract requires, but instead directed shares to favored customers. *See id.* ¶¶ 29, 39. *Second,* Credit Suisse did not sell the IPO shares for the price provided in the prospectus, but instead required purchasers to pay a higher price.[8] *See id.* ¶¶ 19, 36, 37. *See also supra* note 5.

Count II alleges that Credit Suisse violated implied covenants of good faith and fair dealing that accompanied its performance of the underwriting agreements. Credit Suisse allegedly violated these covenants by underpricing the IPO shares so that it could allocate undervalued shares to favored clients and receive additional compensation. *See id.* ¶ 49. As a result, the issuers received deficient and overpriced underwriting services. *See id.*

Count III alleges that Credit Suisse owed fiduciary duties of loyalty, due care and fair dealing to the issuers. These duties arose because Credit Suisse was the underwriter of the IPOs and had superior knowledge and expertise, receipt of confidential information, and acted as an agent and advisor to the issuers. *See id.* ¶¶ 52–53. According to the Complaint, Credit Suisse violated those duties by allocating shares to favored customers and sharing in the profits made by those customers. *See id.* ¶¶ 54–55.

Count IV is brought in the alternative to Counts I through III.[9] *See id.* ¶ 58. It asserts a claim of unjust enrichment against Credit Suisse on the ground that the issuers "conferred benefits upon Defendant in connection with their IPOs which, in the circumstances ... would be inequitable for Defendant to retain." *Id.* ¶ 58. Count IV further alleges that the profit-sharing compensation from favored customers unjustly enriched Credit Suisse. *See id.* ¶¶ 60, 61.

### C. Credit Suisse's Motion to Dismiss

Credit Suisse argues that MDCM's complaint should be dismissed, in its entirety or in part, for five reasons. "*First,* MDCM's state law claims are barred by the Securities Litigation Uniform Standards Act of 1998 ('SLUSA'), Pub L. No. 105–353, 112 Stat. 3227 (codified at 15 U.S.C. §§ 77p, 78bb(f))." Memorandum of Law in Support of Defendant Credit Suisse First Boston's Corporation's Motion to Dismiss the Amended Complaint

---

**7.** The proposed class includes companies such as VA Linux, MarketWatch.com, Akamai Technologies, Cacheflow and Sycamore Technologies. *See* Am. Compl. ¶ 28.

**8.** The contract between Credit Suisse and Mortgage.com states in pertinent part:

3. *Purchase, Sale and Delivery of Offered Securities.* On the basis of the representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Company agrees to sell to the Underwriters, and the Underwriters agree, severally and not jointly, to purchase from the Company, at a purchase price of $ 7.44 per share, the respective numbers [sic] of shares of Firm Securities set forth opposite the names of the Underwriters in Schedule A hereto.

＊　　＊　　＊　　＊　　＊　　＊

4. *Offering by Underwriters.* It is understood that the several Underwriters propose to offer the Offered Securities for sale to the public as set forth in the Prospectus.
8/11/99 Underwriting Agreement at 5–6.

**9.** "Under Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency." *Henry v. Daytop Vill., Inc.,* 42 F.3d 89, 95 (2d Cir.1994).

("Def.Mem.") at 2. "*Second,* MDCM lacks standing to assert these claims." *Id.* "*Third,* claims for breach of contract and the implied covenant of good faith and fair dealing are deficient because MDCM does not and cannot identify any contractual provision that has been breached." *Id.* "*Fourth,* MDCM cannot claim that CSFB was unjustly enriched because ... the doctrine of unjust enrichment cannot be used here to create new contract obligations where a valid written agreement already exists." *Id.* "*Finally,* the claim for breach of fiduciary duty is preempted under New York's Martin Act, N.Y. Gen. Bus. Law § 352 [New York's securities statute], *et seq.*" *Id.*

## IV. SLUSA DOES NOT BAR THIS CLASS ACTION

### A. Statutory Framework and Purpose

When Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"), it sought to raise the bar for bringing class actions under the Securities Act of 1933 and Securities Exchange Act of 1934. Among other things, the PSLRA heightened pleading standards, generally required courts to stay discovery pending resolution of a motion to dismiss, and placed limits on recovery. *See* 15 U.S.C. § 77z–1 to–2 (Securities Act of 1933); 15 U.S.C. §§ 78u–4 to –5 (Securities Exchange Act of 1934). In the aftermath of the PSLRA, however, plaintiffs increasingly filed securities class actions in state courts under state law theories of liability.[10]

Congress responded in 1998 by enacting SLUSA, which aims to "prevent plaintiffs

from seeking to evade the protections that Federal law provides against abusive litigation by filing suit in State court, rather than Federal court." H.R.Rep. No. 105–803 (1998). The purpose of SLUSA was to make federal court the exclusive venue, and federal law the exclusive remedy, for most securities class actions. SLUSA provides in pertinent part:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
>
> (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 77bb(f)(1).

SLUSA thus provides for federal preemption of any claim that meets four prerequisites. The lawsuit must be: (1) a "covered class action"; (2) based on state law; (3) in which the plaintiff has alleged either a "misrepresentation or omission of a material fact" or "any manipulative or deceptive device or contrivance;" (4) "in connection with the purchase or sale of a covered security." *Id. See also Green v. Ameritrade, Inc.,* 279 F.3d 590, 596 (8th Cir.2002) (outlining four elements of SLUSA) (citations omitted). Because plaintiffs do not allege the third element of SLUSA—misrepresentations or omissions—the statute does not preempt their class action.[11]

---

10. *See* Michael A. Perino, "Fraud and Federalism: Preempting Private State Securities Fraud Causes of Action," 50 *Stan. L. Rev.* 273, 298–315 (1998).

11. The parties agree that two of these elements are satisfied: This is a "covered class action" because it involves a putative class of over one hundred issuers, *see* 15 U.S.C. § 78bb(f)(5)(B)(i)(II), and the action is brought under state law, *see* Am. Compl.

## B. MDCM's Complaint Does Not Allege Any Misrepresentations or Omissions

When determining whether SLUSA preempts a lawsuit, a court is directed to look at what the "private party [is] *alleging*." 15 U.S.C. § 78bb(f)(1) (emphasis added).[12] MDCM only alleges than that Credit Suisse signed numerous contracts in which it promised to do one thing but then did another. "The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract. It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993). MDCM has not al-

leged that Credit Suisse had such an intent and, to prevail on its breach of contract claims, MDCM need not offer any evidence about Credit Suisse's mental state. Under its current claims, it only needs to prove that Credit Suisse did not satisfy the requirements laid out in the underwriting agreements. Therefore, the contract claims do not involve allegations of misrepresentation or omissions by Credit Suisse.[13]

Credit Suisse argues that "courts ... have disregarded state law labels and dismissed [such] claims under SLUSA." Def. Mem. at 8 (citations omitted). The cases relied on by Credit Suisse, however, involve plaintiffs who made *explicit* allegations of misrepresentation or material omission.[14] In none of those cases was it

---

¶¶ 32–61. Because I find that the SLUSA's third element is not satisfied, I make no finding with respect to MDCM's argument that its claims do not satisfy the SLUSA's requirement that the allegations be made "in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1). *See, e.g., Green*, 279 F.3d at 597–99.

12. The requirement that courts look at what the party is alleging is particularly important given that the facts underlying a complaint may often give rise to multiple allegations (*e.g.*, fraud, misrepresentation, and breach of contract). Because the determination of whether SLUSA applies may only be made by reference to what a party has alleged, and not what it *could* have alleged, courts should be wary of a defendant's attempts to recast the plaintiff's complaint as a securities lawsuit in order to have it preempted by SLUSA.

13. Moreover, the Second Circuit has refused to infer fraudulent intent from the fact that a defendant "made a number of contracts ... and never performed any of them." *Mills*, 12 F.3d at 1176. "Contract breach, in and of itself, does not bespeak fraud, and generally does not give rise to tort damages," which rise out of claims of fraud and misrepresentation. *Id.*

14. Credit Suisse cites the following cases: *McCullagh v. Merrill Lynch & Co.*, No. 01 Civ. 7322, 2002 WL 362774, at * 6 (S.D.N.Y.

Mar.6, 2002) (alleging that "misrepresentation regarding the quality of investment advice ... [plaintiffs] received [was] tainted by a company policy requiring employees to issue 'buy' recommendations"); *Korsinsky v. Salomon Smith Barney*, No. 01 Civ. 6085, 2002 WL 27775, at *4 (S.D.N.Y. Jan.10, 2002) (stating that plaintiff's complaint "outlines several instances of alleged misrepresentations made by SSB and Grubman with regard to the value of AT & T"); *Burekovitch v. Hertz*, No. 01 Civ. 1277, 2001 WL 984942, at *5–*6 (E.D.N.Y. July 24, 2001) (stating that the "claim rests on alleged misrepresentations or omissions"); *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F.Supp.2d 371, 443 (S.D.N.Y. 2001) (stating that the claims were "all grounded on alleged misstatements in Livent's Registration Statement, Prospectus or August 1998 Press Release made in connection with the sale of the Notes"); *Prager v. Knight/Trimark Group, Inc.*, 124 F.Supp.2d 229, 234–35 (D.N.J.2000) (stating that plaintiff "alleged that [defendant] falsely stated in various public filings" and "alleges ... false and misleading statements"); *Haney v. Pacific Telesis Group*, No. 00 Civ. 758, 2000 WL 33400194, at *20 (C.D.Cal. Sept.19, 2000) (complaint alleged misrepresentation under section 10(b) of securities law); *Gibson v. PS Group Holdings, Inc.*, No. 00 Civ. 0372, 2000 WL 777818, at *1 (S.D. Cal. June 14, 2000) ("According to Plaintiff, the proxy [statement] contains various misrepresentations and

necessary for the court to rewrite the plaintiff's allegations by adding misrepresentation or fraud to the complaint, or for the court to speculate about the defendant's intent at the time it signed a contract.

Indeed, in the one case that this Court has found that squarely addresses whether SLUSA preempts class actions that are explicitly based on contract law, the court concluded it did not. *See Green v. Ameritrade*, 120 F.Supp.2d. 795, 796 (D.Neb. 2000), *aff'd on other grounds*, 279 F.3d 590, 597–99 (8th Cir.2002). In *Green*, the plaintiff brought a class action against Ameritrade, a provider of online securities price information and stock brokerage services. The amended complaint alleged that Ameritrade breached its contracts with subscribers who used the company "to obtain last sales information or real time market quotes for stocks or options via the internet." *Id.* at 796. Because the amended complaint alleged "nothing other than a claim for breach of express agreements by Ameritrade," the plaintiff's claim required no proof as to whether Ameritrade misrepresented or committed fraud about its intent to satisfy its contracts and SLUSA was not applicable. *Id.* at 799 (citing *Burns v. Prudential Secs.*, 116 F.Supp.2d 917 (N.D.Ohio 2000)).

Here, it would be inappropriate to transform MDCM's contract claims into fraud claims because New York law would require dismissal of such claims. "Under New York law, a fraud claim is precluded where it relates to a breach of contract." *Trepel v. Abdoulaye*, 185 F.Supp.2d 308, 310 (S.D.N.Y.2002) (applying New York law). "[A] simple breach of contract is not to be considered a tort unless a legal duty

*independent* of the contract itself has been violated." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (emphasis added). "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract." *Id.*

Most courts that have considered the issue have held that, under New York law, a contract claim cannot be converted into a fraud claim merely by adding " 'an allegation that the promisor intended not to perform when he made the promise.' " *Shred–It, USA, Inc. v. Mobile Data Shred, Inc.*, 202 F.Supp.2d 228, 237 (S.D.N.Y. 2002) (quoting *Papa's–June Music, Inc. v. McLean*, 921 F.Supp. 1154, 1160 (S.D.N.Y. 1996)). Rather, to sustain a fraud claim arising out of a contractual relationship a plaintiff must:

> (i) demonstrate a legal duty separate from the duty to perform under the contract;
>
> (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or
>
> (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

*Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir.1996) (citations omitted). *See also Papa's–June Music, Inc.*, 921 F.Supp. at 1160–61 (collecting cases). These elements have not been alleged by MDCM, and neither this Court nor the defendant have the right to redraft the complaint to include new claims.[15] *See The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716 (1913)

---

omissions concerning the fairness of the proposed acquisition.").

**15.** Nor does the complaint allege "any manipulative or deceptive device or contrivance." 15 U.S.C. § 77bb(f)(1). "Manipulation is 'virtually a term of art when used in connection

with securities markets.' The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476–77, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (quoting *Ernst &*

(Holmes, J.) ("Of course, the party who brings a suit is master to decide what law he will rely upon . . . ."); *see also Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.,* —— U.S. ——, 122 S.Ct. 1889, 1894, 153 L.Ed.2d 13 (2002) (same). Accordingly, SLUSA does not preempt plaintiffs' contract-related claims against Credit Suisse.

## V. CREDIT SUISSE'S REMAINING ARGUMENTS

### A. MDCM Has Standing to Bring this Class Action

Credit Suisse's second argument in support of its motion to dismiss is that MDCM lacks standing because:

> [e]ach of MDCM's legal claims is founded on the same core theory of injury—namely that [Credit Suisse] deliberately and secretly "underpriced" stock in the "hot" IPOs of unwitting putative class members, thereby depriving them of "millions of dollars" in IPO proceeds. But, MDCM cannot claim to have suffered this injury because the Mortgage.com IPO was indisputably neither hot nor underpriced.

Def. Mem. at 11. Credit Suisse then proffers "judicially noticeable facts" to support its claim that Mortgage.com was not a "hot" stock.[16] *See id.*

Even if this argument has merit, it cannot be considered on a motion to dis-

miss because it contests the facts alleged by MDCM in its Amended Complaint. "At the pleading stage, general factual *allegations* of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) (alteration in original) (emphasis added).

It is undisputed that Credit Suisse entered into underwriting agreements with Mortgage.com, now known as MDCM, and other internet-related and high technology companies that issued stock in the late 1990s. In its Amended Complaint, MDCM has alleged that Credit Suisse violated those agreements. This allegation, regardless of its validity, gives MDCM standing because "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts *must* accept as true all material allegations of the complaint, and *must* construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (emphasis added). *See also Connecticut v. Physicians Health Servs. of Connecticut, Inc.,* 287 F.3d 110, 114 (2d Cir.2002) (same).[17]

---

*Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Although the conduct alleged by Credit Suisse may (or may not) constitute manipulation if brought in a securities lawsuit, this is not what MDCM alleges in its complaint. Moreover, it is unnecessary for MDCM to prove that Credit Suisse manipulated the market in order for MDCM to prevail on its contract claims.

16. For example, Credit Suisse asserts that "[o]n the first day of trading, the [Mortgage.com] stock closed at $7.16, 10.5% *below* the $8.00 offering price." Def. Mem. at 11 (emphasis in original).

17. Credit Suisse claims that "[r]egardless of how MDCM defines the class, the *injury* that it asserts is the underpricing of the IPOs." Def. Mem. at 11 (emphasis in original). This argument fails because it confuses the *legal* injury for which the plaintiff seeks redress (or injuries if there are multiple claims) and the *factual injuries* underlying those claims. For example, an employee who is sexually harassed by a supervisor is injured, in the common sense of the word, by the harassment. But her legal injury is working in a hostile work environment based on her gender. *See, e.g., Meritor Sav. Bank v. Vinson,* 477 U.S. 57,

## B. MDCM Has Alleged Viable Claims of Breach of Contract, Breach of Good Faith, and Breach of Fiduciary Duty

Credit Suisse's third argument is that "[n]owhere does MDCM identify any express term of the Underwriting Agreement that has been breached. For this fundamental reason, MDCM's claims for breach of contract and breach of the implied covenant of good faith and fair dealing must be dismissed."[18] Def. Mem. at 14. This argument fails because all that is required at this stage of the proceedings is "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). As the Supreme Court recently emphasized: "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz*, 122 S.Ct. at 998 (quoting *Conley v. Gibson*, 355 U.S. at 47, 78 S.Ct. 99). "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.*

"The essential elements to pleading a breach of contract under New York law are the making of an agreement, performance by the plaintiff, breach by the defendant, and damages suffered by the plaintiff." *Startech, Inc. v. VSA Arts*, 126 F.Supp.2d 234, 236 (S.D.N.Y.2000). *See also Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994). In this case, MDCM has alleged the following elements of a breach of contract claim:

(1) Credit Suisse entered into a contract to underwrite MDCM's IPO, *see* Am. Compl. ¶¶ 36–38, 46–48;

(2) MDCM complied with the contract, *see id.* ¶ 42;

(3) Credit Suisse breached that contract by, for example, failing to sell the stock to the public as set forth in the Prospectus and failing to sell it at the agreed upon price, *see id.* ¶¶ 38–39;

(4) MDCM was damaged by those breaches, *see id.* ¶¶ 41, 44, 49–50.

These allegations, along with the numerous other factual allegations contained in the Complaint, give Credit Suisse fair notice of the claims that are brought against it. *See Conley*, 355 U.S. at 47, 78 S.Ct. 99. A review of the Amended Complaint shows that the same is true of MDCM's claims that Credit Suisse breached implicit covenants of good faith and fair dealing and breached certain fiduciary duties. Nothing more is required of MDCM at the pleading stage. *See Swierkiewicz*, 122 S.Ct. at 998; *see also Higgs v. Carver*, 286 F.3d 437, 439 (7th Cir.2002) (Posner, J.) ("All that's required to state a claim in a complaint filed in a federal court is a short statement, in plain (that is, ordinary, non-legalistic) English, of the legal claim.")

## C. MDCM Has Properly Alleged a Claim of Unjust Enrichment

Credit Suisse's fourth argument is that "[b]ecause the [underwriting] [a]greement directly controls the consideration that Mortgage.com was to receive from CSFB for its shares, MDCM cannot now recover what it believes to be the real worth of its shares through a claim for unjust enrichment."[19] Def. Mem. at 21. It is true that

---

106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Similarly, the alleged legal injury here is the breach of contract (*i.e.*, failure to preform under an agreement that plaintiff expected to be performed as written.) This legal injury arose, in part, through defendant's failure to sell the stock at the agreed-upon price. *See infra* Part V.B.

**18.** *But see supra* note 8 (quoting the Underwriting Agreement that MDCM alleges was breached).

**19.** To assert a claim of unjust enrichment, a plaintiff must allege "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the cir-

"unjust enrichment is a quasi-contractual remedy imposed only in the absence of an express contract and is not available 'when a valid and enforceable written contract governing the same subject matter exists.'" *Id.* (quoting *Granite Partners, L.P. v. Bear Stearns & Co.*, 17 F.Supp.2d 275, 311 (S.D.N.Y.1998)). Nevertheless, MDCM's claim of unjust enrichment survives at the pleading stage because a party may plead in the alternative.

■ "Under Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency." *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir.1994). Whether the contracts at issue, in fact, cover the subject matters in controversy has not been determined. If "[this] Court ultimately finds that the subject matter of the contract includes CSFB's distribution of MDCM's shares to the public, then MDCM concedes [that its unjust enrichment claim] should be dismissed." MDCM Holdings Inc.'s Memorandum of Law In Opposition to Credit Suisse's Motion to Dismiss at 31. But should this Court find otherwise, and therefore dismiss MDCM's three contract claims, MDCM will be allowed to proceed on its unjust enrichment claim. Either way, it is not appropriate to dismiss the unjust enrichment claim at this time.

### D. The Martin Act Does Not Preempt MDCM's Claim of Breach of Fiduciary Duty

Credit Suisse's final argument is that MDCM's claim of breach of fiduciary duties falls within the scope of the Martin Act, New York's securities statute.[20] *See* N.Y. Gen. Bus. Law §§ 352 to 359–h. This claim is without merit because the Amended Complaint does not allege violations of any securities law—state or federal. This lawsuit involves a contract dispute, not a securities action. *See supra* Part IV.B. "[T]here is nothing in ... the New York Court of Appeals cases [cited by the defendants] or in the text of the Martin Act itself to indicate an intention to abrogate common law causes of action." *Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2498, 2001 WL 1112548, at *4 (S.D.N.Y. Sept.19, 2001).

## VI. CONCLUSION

For the reasons given above, Credit Suisse's motion to dismiss is denied.[21] A conference is scheduled for July 2, 2002, at 3:30 p.m.

SO ORDERED.

cumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir.2001) (citations omitted). *See also* Am. Compl. ¶¶ 56–61.

20. *See, e.g.,* N.Y. Gen. Bus. Law § 352–c. ("It shall be illegal ... to use or employ any of the following acts or practices ... [involving

fraud, deception, etc.] ... where engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation or purchase within or from this state of any *securities or commodities* ...." (emphasis added)).

21. Credit Suisse's pending motion to stay discovery until resolution of the motion to dismiss is now denied as moot.