**W. Caffey NORMAN, III, On Behalf of Himself and All Others Similarly Situated, Plaintiff,**

v.

**SALOMON SMITH BARNEY INC., Defendant.**

No. 03 Civ. 4391(GEL).

United States District Court, S.D. New York.

June 9, 2004.

Linda P. Nussbaum, Catherine A. To-
rell, Cohen, Milstein, Hausfeld & Toll,

P.L.L.C., New York, NY, (Steven J. Toll, Joshua S. Devore, Christopher F. Branch, Washington, D.C.); Thomas Earl Patton, Steven C. Tabackman, Brian C. Quinn, Tighe Patton Armstrong Teasdeal, PLLC, Washington, D.C.; Terry Rose Saunders, Thomas A. Doyle, Saunders & Doyle, Chicago, IL for plaintiffs W. Caffey Norman, III and All Others Similarly Situated, of counsel.

Richard A. Rosen, Eric S. Goldstein, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY; Peter K. Vigeland, Wilmer, Cutler & Pickering, New York, N.Y. for defendant Salomon Smith Barney Inc.

## OPINION AND ORDER

LYNCH, District Judge.

This action involves claims by customers of defendant Salomon Smith Barney ("Salomon") that Salomon breached its fiduciary and contractual duties to those customers and violated the Investment Advisors Act of 1940 ("IAA"). Plaintiffs are a proposed class of investors who held Guided Portfolio Management ("GPM") accounts at Salomon, which offered individualized investment management services based on the recommendations of Salomon research analysts, recommendations that plaintiffs allege were tainted by conflicts of interest that were undisclosed to Salomon's GPM customers. Salomon moves to dismiss the complaint in its entirety, arguing that (i) plaintiffs' state law claims are preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), (ii) plaintiffs' IAA claims must be dismissed because the named plaintiff has no remedy under IAA and the IAA claims are time-barred, and (iii) the complaint fails to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). For the reasons that follow, the motion will be denied.

## BACKGROUND

Defendant Salomon is a financial services firm that offers a range of products and services to both individual and corporate clients, including investment banking, research and analysis, and individual investment accounts. One of the products offered by Salomon was a custodial account service called Guided Portfolio Management ("GPM"), in which individual investors hired Salomon to act as investment adviser with full discretion to make all investment decisions for the account. (Compl.¶ 8.) The GPM account agreement specifically provided that the Guided Portfolio Manager would be responsible for making investment management decisions, "within guidelines set forth by [the Portfolio Management Group] and based upon the recommendations of the Research Department of Salomon Smith Barney." (Id. ¶ 9.) Salomon's advertising and public statements regarding the GPM program emphasized that the key benefit offered to GPM investors was individual portfolio management guided by the experience and "breadth and depth" of Salomon's research department. (Id. ¶ 12.) In exchange for these services and benefits, GPM clients paid Salomon an annual fee based on the market value of account assets—ranging from 2.5% on the first $500,000 in assets, to 1.4% on assets worth more than $2 million. (Id. ¶ 8.)

Plaintiffs allege that while Salomon was trumpeting the value of its research department and collecting fees from GPM account-holders, Salomon and its executives and officers privately believed those research services and recommendations to be "worthless" and "ridiculous," and expressed a growing concern over the "objectivity" and "integrity" of Salomon's research analysts. (Id. ¶ 19.) Plaintiffs allege that Salomon's own policies and practices were the cause of the problems

with Salomon's research department—that, rather than providing independent and objective coverage of corporations and their securities, Salomon's research analysts were instructed on how to create reports that would assist the investment banking division in securing lucrative business from corporate issuers (*id.* ¶ 24), and were compensated according to how much Salomon earned in investment banking fees from corporations in the analyst's coverage sector (*id.* ¶ 26). Neither the opinions of Salomon executives about the allegedly conflicted research department, nor the policies that created and encouraged the conflict, were disclosed to GPM account-holders.

Plaintiff Norman opened a GPM account at Salomon on November 16, 1999, and maintained the account until May 15, 2002. (Compl.¶ 6.) He seeks to represent a class of individuals who held GPM accounts during the period January 3, 1998, through August 15, 2002. (Compl.¶ 41.) Norman filed the Complaint in this action on January 2, 2003, alleging that Salomon breached its contractual and fiduciary duties to plaintiff and to the class of similarly situated investors by managing their GPM accounts based on recommendations it knew to be conflicted and unreliable, and placing the profits of the firm above the best interests of its GPM clients. The Complaint further alleges that Salomon's management of the GPM accounts was in violation of the Investment Advisers Act of 1940. The Complaint seeks to recover the fees paid for GPM services and the losses incurred as a result of Salomon's alleged misconduct. This action was originally filed in the United States District Court for the District of Columbia, and was transferred to this Court by consent in June 2003. Salomon now moves to dismiss the Complaint in its entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and failure to plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b).

## DISCUSSION

### I. *Standard on a Motion to Dismiss*

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts "as true the facts alleged in the complaint" and draws all reasonable inferences in favor of the plaintiff. *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 699–700 (2d Cir.1994). The motion will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Thomas v. City of New York*, 143 F.3d 31, 36 (2d Cir.1998) (internal citations omitted). To be deemed adequate at the pleading stage, a complaint need not use particular words nor demonstrate that plaintiff will prevail on the merits, but need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Fed.R.Civ.P. 8(a)).

### II. *SLUSA Pre-emption*

Salomon argues that the plaintiff's common law breach of fiduciary duty and breach of contract claims are pre-empted by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 77p, and must be dismissed. SLUSA was enacted by Congress in 1998 to address the problem of securities litigation shifting to state courts to avoid the strictures of the Private Securities Litigation Reform Act of 1995. The SLUSA solution was "to make Federal court the exclusive venue for most securities fraud class action litigation involving nationally traded securities." Joint Explanatory Statement of the Com-

mittee of Conference, H.R. Conf. Rep. 105–803 (1998). SLUSA accomplishes this goal by providing that "[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A).

The parties do not dispute that the present action is a "covered class action" and that the breach of contract and breach of fiduciary duty claims are based on state common law. As to the remaining factors, Salomon argues that the heart of the Complaint involves allegations that the Salomon research reports contained material misrepresentations or omissions regarding the value of securities, and that the purchase and sale of securities in the GPM accounts was based on these alleged misrepresentations and omissions. (D.Mem.7–9.) In support of its claim that these allegations bring the present action within SLUSA's pre-emption provisions, Salomon cites to a litany of cases holding that actions against broker-dealers for the misrepresentations and omissions in their research analyst reports are covered by SLUSA. (D. Mem. 6 n. 4). However, all of those cases involve actions brought by purchasers or sellers of securities, alleging either that their decisions to purchase or sell were made in direct reliance on false or misleading analyst reports, or that the false or misleading analyst reports perpetrated a "fraud on the market" that caused the plaintiffs' losses from the purchase or sale of securities, even though some of the plaintiffs styled their claims as a common law breach of fiduciary duty. *See, e.g., Politzer v. Salomon Smith Barney, Inc.,* 03 CV 1187(JFW), slip op. (C.D. Cal. June 16, 2003); *Dacey v. Morgan Stanley Dean Witter & Co.,* 263 F.Supp.2d 706

(S.D.N.Y.2003); *Zoren v. Genesis Energy L.P.,* 195 F.Supp.2d 598 (D.Del.2002). The present action is distinguishable from these cases.

■ First, the Complaint simply contains no allegation of fraud, misrepresentation or omission "in connection with" the purchase or sale of securities. The claims at issue are for breach of contract and breach of fiduciary duty, neither of which has fraud or misrepresentation as an element. Breach of contract claims under New York law require that plaintiff show: (1) a valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the breach. *See, e.g., Furia v. Furia,* 116 A.D.2d 694, 498 N.Y.S.2d 12, 13 (2d Dep't 1986); 22A N.Y. Jur.2d Contracts § 432. Similarly, breach of fiduciary duty claims under New York law require only that plaintiff demonstrate (1) a breach by a fiduciary of an obligation owed to plaintiff; (2) defendant's knowing participation in the breach; and (3) damages resulting therefrom. *See, e.g., SCS Communications, Inc. v. Herrick Co.,* 360 F.3d 329, 342 (2d Cir.2004). While plaintiffs may not avoid SLUSA pre-emption simply by artful pleading that avoids the actual words "misrepresentation" or "fraud," neither may defendants avoid every possible claim by recasting any lawsuit in which a securities broker is a defendant into a securities fraud action. *See MDCM Holdings Inc. v. Credit Suisse First Boston,* 216 F.Supp.2d 251, 257 n. 12 (S.D.N.Y.2002) (noting that facts underlying a complaint may give rise to multiple possible allegations, but "[b]ecause the determination of whether SLUSA applies may only be made by reference to what a party has alleged, and not what it *could* have alleged, courts should be wary of a defendant's attempts to recast the plaintiff's complaint as a securities lawsuit in order to have it pre-empted by SLUSA.");

*Gray v. Seaboard Securities, Inc.,* 241 F.Supp.2d 213, 219 (N.D.N.Y.2003) (reading SLUSA so broadly as "to preempt state law claims that require no proof of misrepresentations or omissions and are, at most, tangentially connected to the purchase or sale of a covered security . . . is at odds with the well-settled principle that federalism concerns impel 'the presumption that Congress did not intend to displace state law.' ") (quoting *Greater New York Metro. Food Council, Inc. v. Giuliani,* 195 F.3d 100, 105 (2d Cir.1999)).

■ Here, the gravamen of the Complaint is plainly a straightforward breach claim: plaintiffs purchased a service (portfolio management) pursuant to a contract, paid the fees for that service under the contract, and now allege that they did not receive the full range of services paid for, and suffered damages as a result. Plaintiffs further allege that, in the course of providing some of the contracted-for services, defendant breached its fiduciary duty to plaintiffs to act in their best interests and not engage in activities that would place its interests in conflict with theirs. Regardless of the factual merits of these claims, they are not securities fraud claims, nor claims that depend on establishing material misrepresentations or omissions in connection with the purchase or sale of securities, within the meaning of SLUSA. *See Magyery v. Transamerica Financial Advisors, Inc.,* 03 Civ. 0777(AS), 2004 WL 926941, at *7–8 (N.D.Ind. Apr. 16, 2004) (breach of contract action for unauthorized trading is not preempted by SLUSA; "attempting to read a fraud claim into a breach of contract claim blurs the distinction between two separate causes of action and merges them into one."); *Gray,* 241 F.Supp.2d at 220–21 (claims for breach of contract and fraud in the inducement on behalf of class of plaintiff investors who claimed they paid elevated commission

fees for services they didn't receive are not covered by SLUSA); *MDCM,* 216 F.Supp.2d at 257 (allegations that defendant failed to carry out promises made in connection with a securities transaction are not fraud allegations and are not preempted by SLUSA); *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 01 Civ. 3013(DLC), 2001 WL 1182927 (S.D.N.Y. Oct. 9, 2001), *aff'd* 332 F.3d 116 (2d Cir.2003) (although plaintiffs alleged misrepresentation, case does not fall within SLUSA because misrepresentations were about broker-defendant's "bargain with its accountholders" and "not sufficiently connected to the underlying securities").

Second, unlike the plaintiffs in the cases cited by Salomon, plaintiffs here did not purchase or sell any securities to or from Salomon, or in the market generally. It is undisputed that the GPM accounts were discretionary custodial accounts and all decisions about the purchase and sale of securities for those accounts were made by employees of Salomon. Moreover, to the extent the factual recitation in the Complaint may be read to suggest that Salomon analysts may have made material misstatements or omissions in their analysis of securities, plaintiffs do not claim that they ever saw these reports, relied on them in any way, or made any investment decisions based on their specific recommendations or on the effects those recommendations may have had on the stock market in general. Plaintiffs' claim is simply that Salomon said it would do something in exchange for plaintiffs' fees, and then didn't do what it had promised. The fact that the actions underlying the alleged breach could also form the factual predicate for a securities fraud action by different plaintiffs cannot magically transform every dispute between broker-dealers and their customers into a federal securities claim—the mere "involvement of securities [does] not implicate the anti-fraud provi-

sions of the securities laws." *Spielman,* 2001 WL 1182927 at *3.

Finally, plaintiffs' claims that Salomon did not provide the quality of investment advice it had promised does not depend in any way on establishing that Salomon's research reports contained misrepresentations actionable under the securities laws. If Salomon provided its clients' portfolio managers with shoddy, useless research produced by conflicted analysts, this may well have violated its contractual promises or fiduciary duties to those clients, even if the analysts' reported their honest opinions, and were thus not subject to suit under the federal securities laws. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1095–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (liability under § 10(b) can be predicated on statements of opinion only where a proffered opinion was not merely incorrect but that speaker deliberately misrepresented his actual opinion). SLUSA pre-emption is intentionally broad, but it is not unlimited, *Spielman,* 332 F.3d at 123, and it does not mandate the dismissal of the state law claims here.

### III. *Investment Advisers Act Claims*

#### A. *Remedies Under the IAA*

Plaintiffs also assert claims under the Investment Advisers Act of 1940 ("IAA"), which provides that any investment adviser contracts whose formation or performance would violate the provisions of the IAA "shall be void." 15 U.S.C. § 80b–15. Courts have interpreted this provision to provide plaintiffs the right to any and all remedies that are "the customary legal incidents of voidness," including restitution. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Salomon seeks to dismiss the IAA claim, arguing not that plaintiffs have failed to sufficiently allege that Salomon's conduct violated the

IAA, but solely that plaintiff Norman is not entitled to the statute's remedy because he closed his GPM account on May 15, 2002. Salomon argues that because Norman's voluntary termination leaves him with no currently extant investment adviser contract, he has no contract to void and thus no remedy under the IAA. The argument makes no sense.

Salomon cites to numerous cases in an unsuccessful effort to support its position that an investor who terminates a contract covered by the statute forfeits his right to restitution under that contract. (D. Mem. 10–11, 10 n. 7.) These cases actually stand for a simple proposition: that the remedies under the IAA are only available where an investor brings suit on the investment adviser's allegedly improper conduct (or vice versa) pursuant to a contract for services, and seeks a remedy consistent with a determination that the contract is void. Thus there is no continuing remedy for conduct that occurs after the contract is terminated or fully performed, *see Frank Russell Co. v. Wellington Mgmt. Co.,* 154 F.3d 97 (3d Cir.1998); no remedy for plaintiffs who are not investor-clients or investment advisers, *see Halle & Stieglitz, Filor, Bullard Inc. v. Empress Int'l Inc.,* 442 F.Supp. 217, 228 (D.Del.1977); *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1094 (S.D.N.Y.1977); no remedy for conduct that is not pursuant to an investor-adviser contract, *see Paul S. Mullin & Assocs. v. Bassett,* 632 F.Supp. 532, 537 (D.Del.1986) (estate of deceased investment adviser cannot sue employees or other brokerage firms under IAA); *Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc.,* 459 F.Supp. 597, 608 (S.D.N.Y.1978) (investment adviser who made unsuccessful bid to manage mutual fund cannot sue fund under IAA); and no remedy that sounds in private damages, *see Conrardy v. Ribadeneira,* 86–1745–C,

1990 WL 66603, at *4 (D.Kan. Apr.19, 1990) (restitution of "consideration paid" under IAA does not include purchase price of securities or diminution in value of securities purchased). Here, Norman was an investor-client, is suing his investment adviser for conduct pursuant to their investor-adviser contract, and seeks restitution of fees paid during the pendency of the contract. None of the cases cited by Salomon bars restitution in these circumstances.

Norman's termination of his GPM contract in order to mitigate his losses, as he is required by law to do, *Cary Oil Co. v. MG Refining & Marketing*, 257 F.Supp.2d 751, 763 (S.D.N.Y.2003), does not deprive him of the remedy of restitution where he seeks only restitution of fees paid prior to termination. To require that an investor maintain his account through the pendency of an action under the IAA, continuing to pay fees to the investment adviser after he has become aware of the damaging conduct, so as not to forfeit his remedies under the Act, would be absurd and wholly at odds with the investor-protection purposes of the statute.[1] *See, e.g., Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir.1996) ("Where an examination of the statute as a whole demonstrates that a party's interpretation would lead to 'absurd or futile results ... plainly at variance with the policy of the legislation as a whole,' that interpretation should be rejected.") (quoting *EEOC v. Commercial Office Prods.*, 486 U.S. 107, 120, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988)).

However, the Court need not entertain the complex statutory-purpose and equity analysis put forth by plaintiffs (P. Mem.15–16), as the correct result here is suggested by the well-established principles of contract law and the "customary legal incidents of [contractual] voidness," which the Supreme Court has declared to be the source of private rights under the IAA. *Transamerica*, 444 U.S. at 19, 100 S.Ct. 242. The IAA renders "void" and unenforceable any investment advisor contract whose formation or performance violates the other provisions of the Act. Thus, the correct analogy here is to other types of contracts that are void *ab initio* because of the statute of frauds or because they are against public policy (whether embodied in statute or broader notions of public welfare). Even where these contracts have been "terminated" through completion of performance or the action of one party, restitution continues to be available as a remedy to a wronged party. *See, e.g.,* Restatement 2d Contracts § 198 (Restitution in Favor of Party Who Is Excusably Ignorant or Is Not Equally in the Wrong); *Nursing Home Consultants v. Quantum Health Services*, 926 F.Supp. 835, 846 (E.D.Ark.1996) (where contract is void for illegality of performance, less culpable party, who is within the class of persons that the statute is designed to protect, is entitled to seek equitable recovery) (citing *Peyton v. Margiotti*, 398 Pa. 86, 156 A.2d 865, 868–69 (1959)); Restatement 2d Contracts § 375 (Restitution When Contract Is Within Statute of Frauds); *Grappo v. Alitalia*, 56 F.3d 427, 433 (2d Cir.1995) (former employee who resigned over dispute with employer, though barred from enforcing contract that is void due to statute of frauds, may still seek equitable recovery). There is thus no basis in either the language of the IAA or in the principles of contract law to deny Norman's

---

1. Indeed, if Norman had acted in such a way, presumably Salomon would now be arguing that he had forfeited his right to have the contract declared void by affirming the contract through continued performance after being on notice of the violative conduct, and thus was entitled to no remedy under the IAA.

right to seek the remedy of restitution of fees paid to Salomon for his GPM account.

### B. *Statute of Limitations under the IAA*

■ Salomon also argues that plaintiffs' IAA claim should be dismissed because it is time-barred, citing to a large number of news articles concerning analyst conflicts and compensation schemes that Salomon contends should have put plaintiffs on "inquiry notice" of their claims long before January 2001.[2] Where a defendant seeks to have claims dismissed at the pleading stage on a statute of limitations ground, the defendant bears the burden of establishing that the limitations period has run, *In re Integrated Resources Real Estate Ltd. P'ships Sec. Litig.*, 815 F.Supp. 620, 638 (S.D.N.Y.1993), and the Court's task in ruling on such a motion is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir.1998) (internal quotations omitted).

In evaluating the statute of limitations on IAA claims, courts have employed the same "inquiry notice" standard that governs limitations periods on other securities law claims. *Capital District Physician's Health Plan v. O'Higgins*, 939 F.Supp. 992, 999–1000 (N.D.N.Y.1996) (a plaintiff bringing an IAA claim "will be deemed to have discovered the violation when he or she 'obtains actual knowledge of the facts giving rise to the action or notice of the facts which, in the exercise of reasonable diligence, would have led to actual knowledge.'") (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir.1992)); *see also Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir.1993)

(the limitations period for securities fraud is triggered "when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud.... [W]hen circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry.").

While Salomon's evidence regarding media coverage of analyst conflicts raises some questions as to whether plaintiffs had inquiry notice of the relevant facts prior to January 2001, resolution of this issue on a motion to dismiss is "often inappropriate," *LC Capital Partners LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156 (2d Cir.2003), because the question of whether a plaintiff exercised due diligence in making the required inquiry is "usually a question of fact for the jury to decide." *Integrated Resources*, 815 F.Supp. at 638. This is particularly true where, as here, the defendant bases its notice arguments on documents wholly outside the Complaint. (*See* Rosen Affidavit and Exhibits therein.) Although courts in this district have found that plaintiffs in securities fraud suits, and in particular "fraud on the market" suits, can be charged with knowledge of publicly available documents such as news articles, and have dismissed those complaints at the pleading stage based on review of such documents, *see, e.g., In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 273 F.Supp.2d 351, 378–79 (S.D.N.Y.2003), a similar result would be inappropriate here.

■ As noted extensively above, this action is not a securities fraud case, much less a "fraud on the market" case where

---

**2.** The parties agree that the IAA claims here are governed by the two-year/five-year statute of limitations incorporated into the Sarbanes-

Oxley Act of 2002, Pub.L. No. 10–204 (codified at 28 U.S.C. § 1658).

investors argue that the defendant's contribution to the total mix of information on a particular security was the cause of their losses. This proposed class of plaintiffs were consumers of a comprehensive portfolio management product offered by Salomon, in which Salomon made all investing decisions and plaintiffs paid substantial fees in order to be wholly relieved of the burden of managing their investments, monitoring financial information, and filtering the vast array of investment news available in an ever-expanding media universe. It is far from clear that such plaintiffs should appropriately be charged with knowledge of the news articles cited by Salomon. Moreover, the cited articles do not clearly provide the "storm warnings" of the alleged scheme *at Salomon* that are required to trigger a duty of inquiry under the law of this Circuit. *See, e.g., Levitt v. Bear, Stearns & Co.,* 340 F.3d 94, 101 (2d Cir.2003). A reasonable fact finder might well conclude that news articles reflecting general concern about conflicts of interest among securities analysts would not put a reasonable investor on inquiry notice that his particular financial services firm was not providing the kind of quality portfolio management it had specifically contracted to provide. Viewing the allegations in the Complaint in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor (as the Court must on a motion to dismiss), at a minimum legitimate factual disputes remain regarding when plaintiffs' duty to inquire arose, and when any such inquiry could have led to discovery of the facts underlying their claim that Salomon's conduct regarding the GPM accounts violated the IAA.[3]

**IV.** *Pleading Standards under Rule 9(b)*

■ Finally, Salomon moves to dismiss all of the claims, and the IAA claims in particular, on the ground that plaintiffs have failed to satisfy the heightened pleading standards for fraud under Federal Rule of Civil Procedure 9(b). First, as discussed above, plaintiffs' state law claims do not sound in fraud and thus they are not required to satisfy the strictures of Rule 9(b) or the PSLRA. Likewise, the gravamen of plaintiffs' IAA claim does not rest in fraud, but rather in breaches, through omission, of the broad regime of fiduciary duty between investment advisors and their clients created by the IAA. Although Salomon cites to a handful of cases in which courts have required IAA claims to be pled with particularity under 9(b) (D.Mem.24–25), those cases were all rooted in allegations of fraud, as chiefly evidenced by the coupling of IAA claims in those cases with fraud claims under section 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder. *See, e.g., Nairobi Holdings Ltd. v. Brown Bros. Harriman Co.,* 02 Civ. 1230(LMM), 2002 WL 31027550 (S.D.N.Y. Sept. 10, 2002).

The IAA does prohibit fraud and deceit in investment adviser dealings with client, but it is not simply an anti-fraud measure like section 10(b). Unlike claims brought under that section, claims of IAA violations do not require proof of intent or scienter. The IAA's purpose is much broader, reflecting a "congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or subconsciously—to render advice which was not disinterest-

---

**3.** Of course, Salomon need not show that plaintiffs were aware that Salomon's alleged conduct was illegal, only that they were on inquiry notice about the specific facts that form the predicate for their claim. The only undisputed "inquiry notice" event is the Sep-

tember 2002 public announcement of the NASD and New York Attorney General's investigations into Salomon's research practices, well within the two-year discovery period.

ed." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191–92, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). In place of the previous regime of *caveat emptor*, the IAA "created a fiduciary duty on the part of investment advisers to exercise good faith and fully and fairly disclose all material facts to their clients, and an affirmative obligation 'to employ reasonable care to avoid misleading clients.'" *Morris v. Wachovia Securities, Inc.*, 277 F.Supp.2d 622, 644 (E.D.Va.2003) (quoting *Capital Gains*, 375 U.S. at 192, 84 S.Ct. 275). Plaintiffs' claim rests on allegations that Salomon breached this heightened fiduciary duty by soliciting GPM clients (and their fees) through the promise of "thoughtful investment advice" based on independent research from Salomon's internal analysts, but failed to deliver on that promise and, most importantly, failed to disclose to GPM clients that in fact Salomon itself believed that research to be "worthless" and hopelessly compromised by Salomon's own internal policies regarding compensation and corporate client relationships. These allegations do not depend on proving fraud, and are properly analogized to securities actions under section 11 of the Securities Exchange Act, which, although directed at misrepresentations and omissions, likewise do not require evidence of fraudulent conduct, and thus are not subject to Rule 9(b). *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314–15 (8th Cir.1997).

■ Finally, although the Court need not reach this point, the Complaint in any event appears to satisfy the pleading standards of Rule 9(b). Salomon expounds at length upon the lack of specificity regarding which statements in which analyst re-

ports were false or misleading. However, this tack is merely another aspect of Salomon's efforts to recast this action as a securities fraud case. Unlike the many other complaints pending against Salomon in this Court, the present Complaint does not allege that Salomon defrauded plaintiffs by making false statements about the values of specific stocks and thereby inducing plaintiffs to purchase overvalued securities. To the extent that the Complaint rests on allegations of misrepresentations or omissions, they are misrepresentations or omissions about the GPM program itself, and about the services provided to accountholders in exchange for their fees.[4] The Complaint offers considerable specificity about what plaintiffs were promised in entrusting their money to Salomon, what Salomon employees have said those clients received, and what practices at Salomon allegedly produced this result. (*e.g.*, Compl. ¶¶ 1–3, 9, 12, 14, 19, 24, 26, 35, 38.) Thus, the specificity that Salomon seeks, regarding particular deficiencies in specific research reports, is largely irrelevant, and the lack thereof would not require dismissing the Complaint, even if it were subject to the heightened pleading standards of Rule 9(b).

## CONCLUSION

For all of the foregoing reasons, Salomon's motion to dismiss is denied. The parties are directed to appear before the Court for a status conference on June 25, 2004, at 2:30 p.m.

SO ORDERED.

---

4. Indeed, plaintiff never saw *any* Salomon analyst report, and does not claim to have been misled by them, as he personally made no investment decisions whatsoever. Those decisions were made by Salomon on his be-

half. Nor does plaintiff contend that Salomon itself was misled by the analyst reports; on the contrary, he alleges that Salomon knew its research was "worthless" and failed to disclose that to its clients.