[832 NE2d 26, 799 NYS2d 170]

EBC I, Inc., Formerly Known as eToys, Inc., by the Official Committee of Unsecured Creditors of EBC I, Inc., Respondent, v Goldman, Sachs & Co., Appellant.

Argued March 29, 2005; decided June 7, 2005

## POINTS OF COUNSEL

*Sullivan & Cromwell LLP,* New York City (*John L. Warden, Penny Shane, David M.J. Rein, Jeremy C. Bates* and *Matthew D. Dunn* of counsel), for appellant. I. The Appellate Division's fiduciary duty, professional malpractice and fraud holdings lack any support in the law of New York or otherwise. (*Horn v 440 E. 57th Co.,* 151 AD2d 112; *Scalp & Blade v Advest, Inc.,* 281 AD2d 882; *Northeast Gen. Corp. v Wellington Adv.,* 82 NY2d 158; *511 W. 232nd Owners Corp. v Jennifer Realty Co.,* 98 NY2d 144; *Polonetsky v Better Homes Depot,* 97 NY2d 46; *Caniglia v Chicago Tribune-N.Y. News Syndicate,* 204 AD2d 233; *CIBC Bank & Trust Co. [Cayman] v Credit Lyonnais,* 270 AD2d 138; *Schachter v Citibank,* 193 AD2d 593; *Meinhard v Salmon,* 249 NY 458; *SNS Bank v Citibank,* 7 AD3d 352.) II. The decision below threatens Goldman, Sachs & Co.'s role as gatekeeper to capital markets and creates uncertainty for those who choose New York law to govern underwritings. (*Chris-Craft Indus., Inc. v Piper Aircraft Corp.,* 480 F2d 341, 430 US 1; *Intercontinental Planning v Daystrom, Inc.,* 24 NY2d 372; *Ehrlich-Bober & Co. v University of Houston,* 49 NY2d 574.) III. The creditors' other claims are also flawed and the First Department has erred in reviving them. (*Kirke La Shelle Co. v Armstrong Co.,* 263 NY 79; *511 W. 232nd Owners Corp. v Jennifer Realty Co.,* 98 NY2d 144; *Dalton v Educational Testing Serv.,* 87 NY2d 384; *Chrysler Credit Corp. v Dioguardi Jeep Eagle,* 192 AD2d 1066; *Maxon Intl. v International Harvester Co.,* 82 AD2d 1006; *Paramount Film Distrib. Corp. v State of New York,* 30 NY2d 415; *Clark v Daby,* 300 AD2d 732; *Wiener v Lazard Freres & Co.,* 241 AD2d 114; *Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.,* 70 NY2d 382; *LaBarte v Seneca Resources Corp.,* 285 AD2d 974.)

*Pomerantz Haudek Block Grossman & Gross LLP,* New York

City (*Stanley M. Grossman, Shaheen Rushd* and *Murielle J. Steven* of counsel), *Wachtel & Masyr LLP* (*William B. Wachtel* of counsel) and *Traub, Bonacquist & Fox LLP* (*Paul Traub, Michael S. Fox* and *Susan F. Balaschak* of counsel) for respondent. I. The First Department properly sustained plaintiff's claim for breach of fiduciary duty. (*Xpedior Creditor Trust v Credit Suisse First Boston [USA] Inc.*, 341 F Supp 2d 258; *MDCM Holdings, Inc. v Credit Suisse First Boston Corp.*, 216 F Supp 2d 251; *Kern v Currie Assoc.*, 220 AD2d 255; *Wiener v Lazard Freres & Co.*, 241 AD2d 114; *Conte v U.S. Alliance Fed. Credit Union*, 303 F Supp 2d 220; *LaBarte v Seneca Resources Corp.*, 285 AD2d 974; *FLS Group v Goldinger*, 6 Misc 3d 1003[A]; *Frydman & Co. v Credit Suisse First Boston Corp.*, 272 AD2d 236; *JHH Pictures v Rawkus Entertainment*, 291 AD2d 356; *Societe Nationale D'Exploitation Industrielle Des Tabacs Et Allumettes v Salomon Bros. Intl.*, 251 AD2d 137.) II. The First Department properly reinstated plaintiff's claim for professional malpractice. (*Chase Scientific Research v NIA Group*, 96 NY2d 20; *Bestolife Corp. v American Amicable Life*, 5 AD3d 211; *In re Initial Pub. Offering Antitrust Litig.*, 287 F Supp 2d 497; *Dymm v Cahill*, 730 F Supp 1245; *Castle Oil Corp. v Thompson Pension Empl. Plans*, 299 AD2d 513; *Exeter Bancorporation, Inc. v Kemper Sec. Group, Inc.*, 58 F3d 1306; *Smith v Arthur Andersen L.L.P.*, 175 F Supp 2d 1180; *In re Daisy Sys. Corp.*, 97 F3d 1171; *Cristallina S.A. v Christie, Manson & Woods Intl.*, 117 AD2d 284; *Channel Master Corp. v Aluminium Ltd. Sales*, 4 NY2d 403.) III. The First Department correctly reinstated the fraud claim predicated on Goldman, Sachs & Co.'s receipt of undisclosed illicit compensation. (*Jered Contr. Corp. v New York City Tr. Auth.*, 22 NY2d 187; *Lanzi v Brooks*, 43 NY2d 778; *Virginia Bankshares, Inc. v Sandberg*, 501 US 1083; *Eisenberg v Gagnon*, 766 F2d 770; *Oxford Health Plans [NY] v BetterCare Health Care Pain Mgt. & Rehab*, 305 AD2d 223; *Foley v D'Agostino*, 21 AD2d 60; *Bernstein v Kelso & Co.*, 231 AD2d 314; *Auguston v Spry*, 282 AD2d 489; *Federal Ins. Co. v Specialty Paper Box Co.*, 222 AD2d 254; *Banner Indus. v Schwartz*, 181 AD2d 479.) IV. The First Department properly revived plaintiff's claim of unjust enrichment. (*Clark v Daby*, 300 AD2d 732, 100 NY2d 503; *Todd v Pearl Woods*, 20 AD2d 911, 15 NY2d 817; *Marks v CDW Computer Ctrs., Inc.*, 122 F3d 363; *McGrath v Hilding*, 41 NY2d 625; *Simonds v Simonds*, 45 NY2d 233; *Carriafielio-Diehl & Assoc., Inc. v D&M Elec. Contr., Inc.*, 12 AD3d 478; *Smith v Chase Manhattan Bank, USA*, 293 AD2d 598; *Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 NY2d 382; *Farash v Sykes Datatron-*

*ics,* 59 NY2d 500; *Schuler-Haas Elec. Corp. v Wager Constr. Corp.,* 57 AD2d 707.) V. The First Department correctly reinstated the claim for breach of the implied covenant of good faith and fair dealing. (*Kirke La Shelle Co. v Armstrong Co.,* 263 NY 79; *511 W. 232nd Owners Corp. v Jennifer Realty Co.,* 98 NY2d 144; *MDCM Holdings, Inc. v Credit Suisse First Boston Corp.,* 216 F Supp 2d 251; *Zurakov v Register.Com, Inc.,* 304 AD2d 176; *Havel v Kelsey-Hayes Co.,* 83 AD2d 380; *LaBarte v Seneca Resources Corp.,* 285 AD2d 974; *Richbell Info. Servs. v Jupiter Partners,* 309 AD2d 288; *Paz v Singer Co.,* 151 AD2d 234.) VI. The First Department erred in dismissing plaintiff's claim for breach of the express terms of the underwriting agreement. (*Chrysler Credit Corp. v Dioguardi Jeep Eagle,* 192 AD2d 1066; *Maxon Intl. v International Harvester Co.,* 82 AD2d 1006, 56 NY2d 879; *William C. Atwater & Co. v Panama R.R. Co.,* 246 NY 519.) VII. The First Department properly upheld plaintiff's claim for bankruptcy-related damages. (*Kenford Co. v County of Erie,* 67 NY2d 257; *Associated Textile Rental Servs. v Xerox Corp.,* 2 AD3d 1301; *Gibbs v Breed, Abbott & Morgan,* 271 AD2d 180; *Derdiarian v Felix Contr. Corp.,* 51 NY2d 308; *Steitz v Gifford,* 280 NY 15; *American Fed. Group, Ltd. v Rothenberg,* 136 F3d 897; *Balemian v LB Real Estate Dev. Corp.,* 226 AD2d 223; *Ashland Mgt. v Janien,* 82 NY2d 395; *Lamborn v Dittmer,* 873 F2d 522; *Emergent Capital Inv. Mgt., LLC v Stonepath Group, Inc.,* 343 F3d 189.)

*Cleary, Gottlieb, Steen & Hamilton,* New York City (*Mitchell A. Lowenthal, Lewis J. Liman, David H. Herrington, Nancy I. Ruskin, Stuart N. Mast* and *Amy Chung* of counsel), for Securities Industry Association, amicus curiae. I. Imposing an extra-contractual fiduciary duty dramatically rewrites the actual agreement struck by the parties in the underwriting agreement. (*Abiele Contr. v New York City School Constr. Auth.,* 91 NY2d 1; *Northeast Gen. Corp. v Wellington Adv.,* 82 NY2d 158; *Quantum Chem. Corp. v Reliance Group,* 180 AD2d 548; *Savage Records Group v Jones,* 247 AD2d 274; *National Union Fire Ins. Co. of Pittsburgh, Pa. v Red Apple Group,* 281 AD2d 296; *Carnegie v H&R Block,* 269 AD2d 145; *Prestige Foods v Whale Sec. Co.,* 243 AD2d 281; *V. Ponte & Sons v American Fibers Intl.,* 222 AD2d 271; *Oursler v Women's Interart Ctr.,* 170 AD2d 407; *Blue Grass Partners v Bruns, Nordeman, Rea & Co.,* 75 AD2d 791.) II. Imposing a fiduciary duty is contrary to the business realities of the underwriter-issuer relationship. (*In re Wicat Sec. Litig.,* 600 F Supp 1236; *Birnbaum v Birnbaum,* 73 NY2d 461; *Drucker v Mige Assoc. II,* 225 AD2d 427; *Hasbrouck v*

*Rymkevitch,* 25 AD2d 187.) III. Imposing a fiduciary duty on underwriters is at odds with the regulatory framework of the federal securities laws. (*Chris-Craft Indus., Inc. v Piper Aircraft Corp.,* 480 F2d 341, 430 US 1; *Escott v BarChris Constr. Corp.,* 283 F Supp 643; *Feit v Leasco Data Processing Equip. Corp.,* 332 F Supp 544.) IV. The breach of fiduciary duty claim should have been dismissed as a matter of law. (*National Union Fire Ins. Co. of Pittsburgh, Pa. v Red Apple Group,* 281 AD2d 296; *Carnegie v H&R Block,* 269 AD2d 145; *Savage Records Group v Jones,* 247 AD2d 274.)

## OPINION OF THE COURT

CIPARICK, J.

Plaintiff, the Official Committee of Unsecured Creditors of EBC I, Inc., formerly known as eToys, Inc., brought this action against defendant Goldman, Sachs & Co., the lead managing underwriter of its initial public stock offering, alleging five causes of action related to the underwriting agreement: breach of fiduciary duty, breach of contract, fraud, professional malpractice and unjust enrichment. We hold that plaintiff's complaint fails to state claims for breach of contract, professional malpractice and unjust enrichment. We therefore modify the Appellate Division order to dismiss these claims and, as modified, affirm to allow the fiduciary duty cause of action to proceed. Leave to replead the fraud cause of action was correctly granted; plaintiff has filed an amended complaint, but the sufficiency of that pleading is not before us on this appeal.

## I.

This case involves the underwriting process by which investment banks help take securities to the market in an initial public offering (IPO). Companies may decide to make such an offering for several reasons, including a desire to raise new capital and to create a public market for their shares (*see* 1 Thomas Lee Hazen, Securities Regulation § 3.1 [2] [5th ed]; *see also* Larry D. Soderquist, Understanding the Securities Law § 2:2 *et seq.* [Practising Law Institute 4th ed]). A "firm commitment underwriting," at issue here, typically involves an agreement whereby the "issuer"—or company seeking to issue the security (*see* Securities Act of 1933 [48 US Stat 74, as amended] § 2 [codified at 15 USC § 77b (a) (4)])—sells an entire allotment of shares to an investment firm who purchases the shares with a view to sell them to the public (*see* Securities Act of 1933 § 2 [15

USC § 77b (a) (11)] [defining an "underwriter"]; *see also* 1 Hazen, Securities Regulation § 2.1 [2] [B]; Louis Loss and Joel Seligman, Fundamentals of Securities Regulation ch 2A [3d ed]).

As underwriter, the functions of the investment firm include negotiating an initial public offering price for the securities with the issuer, purchasing the securities from the issuer at a discount and reselling them on the market at the public offering price. The difference or "spread" between the amount the underwriter pays for the securities and the price at which the securities are sold to the public makes up the underwriter's compensation for its services. Because in a firm commitment underwriting the underwriter owns, and is obligated to pay the issuer for the securities regardless of whether it can resell them, it may assemble a group of underwriters, known as a syndicate, to help absorb the risk.[1]

As stated in plaintiff's complaint, in the late 1990's, eToys, Inc., an Internet retailer specializing in the sale of products for children, sought to go public in order to obtain financing necessary to further implement its business plan. In January 1999, eToys retained Goldman Sachs as lead managing underwriter of its initial public offering.[2]

Within the context of its engagement, Goldman Sachs met with potential investors, responded to inquiries about eToys' business and gauged investors' indications of interest in eToys' shares. On April 19, 1999, eToys and Goldman Sachs finalized the underwriting agreement. eToys agreed to sell 8,320,000 shares of its stock to Goldman Sachs and the other underwriters for $18.65 per share with the option to buy an additional 1,248,000 shares at the same price to cover overallotments. The agreement also provided that Goldman Sachs would offer the shares for public sale upon the terms and conditions set forth in the prospectus, which fixed the initial offering price at $20 per

---

**1.** *See* William J. Grant, Jr., *Overview of the Underwriting Process*, in Securities Underwriting: A Practitioner's Guide, at 25-45 (Bialkin and Grant editors, 1985); John S. D'Alimonte, *The Letter of Intent and the Basic Structure of An Offering*, in Securities Underwriting, *supra* at 85-98; David B. Rea and William J. Grant, Jr., *The Syndication and Marketing Process*, in Securities Underwriting, *supra* at 277-291; Samuel N. Allen, *A Lawyer's Guide to the Operation of Underwriting Syndicates*, 26 New Eng L Rev 319, 320-321 (1991).

**2.** Three other comanaging underwriters were BancBoston Robertson Stephens Inc., Donaldson, Lufkin & Jenrette Securities Corp., and Merrill Lynch, Pierce, Fenner & Smith, Inc., who formed the underwriting syndicate, later joined by additional firms. Plaintiff has filed a separate action against the other syndicate underwriters alleging substantially the same claims as here.

share. Thus, Goldman Sachs' potential profit was $1.35 per share or 6.75% of the offering proceeds. Goldman Sachs was to receive a total of at most $12,916,800 from the sale.

On May 20, 1999, the first day of trading, the stock opened at $79 per share, rose as high as $85 per share and closed at $76.56. By the end of the year, however, the stock closed at $25. Soon thereafter, it fell below $20 and never rose above the initial offering price. Eventually, in March 2001, eToys filed a voluntary petition for reorganization under chapter 11 of the United States Bankruptcy Code in the District of Delaware. The Bankruptcy Court appointed the Official Committee of Unsecured Creditors and authorized the committee to bring this action on behalf of eToys, now known as EBC I, Inc.

The complaint alleges that eToys relied on Goldman Sachs for its expertise as to pricing the IPO, and that Goldman Sachs gave advice to eToys without disclosing that it had a conflict of interest. Specifically, the complaint alleges that Goldman Sachs entered into arrangements "whereby its customers were obligated to kick back to Goldman a portion of any profits that they made" from the sale of eToys securities subsequent to the initial public offering. Because a lower IPO price would result in a higher profit to these clients upon the resale of the securities and thus a higher payment to Goldman Sachs for the allotment, plaintiff alleges Goldman Sachs had an incentive to advise eToys to underprice its stock. As a result of this undisclosed scheme, Goldman Sachs was allegedly paid 20% to 40% of the clients' profits from trading the eToys securities.

Relying on these allegations, plaintiff brought five causes of action against Goldman Sachs: breach of fiduciary duty (first), breach of contract (second), fraud (third), professional malpractice (fourth) and unjust enrichment (fifth).[3] In response, Goldman Sachs moved to dismiss the complaint in its entirety for failure to state any cause of action.

Supreme Court in two orders (one denominated judgment) granted the motion to the extent of dismissing the second, third (with leave to replead), fourth and fifth causes of action. The court denied that part of the motion seeking to dismiss the first cause of action for breach of fiduciary duty, finding that "[a]l-

---

**3.** Plaintiff also claimed additional damages incurred by eToys as a result of Goldman Sachs' misconduct causing the failure of the business and its eventual bankruptcy. The Appellate Division ruled that the "proximate cause of the damages claimed is an issue of fact inappropriate for determination at this juncture" (7 AD3d 418, 421 [2004]). We agree.

though the contract did not establish a formal fiduciary relationship . . . the pleading sufficiently raises an issue as [to] the existence of an informal one," and noting that Goldman Sachs had also advised eToys in connection with a preferred stock offering.

The Appellate Division modified the initial order of Supreme Court, opining that the breach of fiduciary duty claim was correctly sustained upon allegations showing a preexisting relationship between eToys, Inc. and Goldman Sachs that justified eToys' alleged trust in pricing the shares. The Court further held that the trial court properly dismissed the fraud cause of action with leave to replead, reasoning that plaintiff did not allege with sufficient particularity who made the purported misrepresentations to eToys, Inc. The Appellate Division, however, disagreed with the Supreme Court as to the breach of contract, professional malpractice and unjust enrichment causes of action, reinstating all three.

Goldman Sachs appeals by leave of the Appellate Division on a certified question. We now modify the order of the Appellate Division by dismissing the second, fourth and fifth causes of action. We agree with the trial court and Appellate Division that the pleading of the fiduciary duty claim is sufficient and that leave to replead the fraud claim was proper.

## II.

In the context of a motion to dismiss pursuant to CPLR 3211, the court must afford the pleadings a liberal construction, take the allegations of the complaint as true and provide plaintiff the benefit of every possible inference (*see Goshen v Mutual Life Ins. Co. of N.Y.*, 98 NY2d 314, 326 [2002]). Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss. Applying this standard, we conclude that plaintiff's allegations of breach of fiduciary duty survive Goldman Sachs' motion to dismiss.

A fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation" (Restatement [Second] of Torts § 874, Comment *a*). Such a relationship, necessarily fact-specific, is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions (*see Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158, 162 [1993]). Generally, where parties have entered into a contract, courts

look to that agreement "to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency" (see id. at 160). "If the parties . . . do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them" (id. at 162). However, it is fundamental that fiduciary "liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation" (Restatement [Second] of Torts § 874, Comment b).

Goldman Sachs argues that the relationship between an issuer and underwriter is an arm's length commercial relation from which fiduciary duties may not arise. It may well be true that the underwriting contract, in which Goldman Sachs agreed to buy shares and resell them, did not in itself create any fiduciary duty. However, a cause of action for breach of fiduciary duty may survive, for pleading purposes, where the complaining party sets forth allegations that, apart from the terms of the contract, the underwriter and issuer created a relationship of higher trust than would arise from the underwriting agreement alone.

Here, the complaint alleges an advisory relationship that was independent of the underwriting agreement. Specifically, plaintiff alleges eToys was induced to and did repose confidence in Goldman Sachs' knowledge and expertise to advise it as to a fair IPO price and engage in honest dealings with eToys' best interest in mind. Essentially, according to the complaint, eToys hired Goldman Sachs to give it advice for the benefit of the company, and Goldman Sachs thereby had a fiduciary obligation to disclose any conflict of interest concerning the pricing of the IPO. Goldman Sachs breached this duty by allegedly concealing from eToys its divided loyalty arising from its profit-sharing arrangements with clients.

Contrary to Goldman Sachs' contention, recognition of a fiduciary duty to this limited extent—requiring disclosure of Goldman Sachs' compensation arrangements with its customers—is not in conflict with an underwriter's general duty to investors under the Securities Act of 1933 to exercise due diligence in the

preparation of a registration statement.[4] An obligation not to conceal from the issuer private arrangements made with a group of potential investors does not compromise Goldman Sachs' charge to be truthful in its public disclosure regarding the issuer's business. For similar reasons, we do not share the dissent's concern that upholding an issuer's fiduciary duty claim against an underwriter "potentially conflicts with a highly complex regulatory framework designed to safeguard investors" (dissenting op at 23). Recognizing a common-law remedy, under these circumstances, will not hinder the efforts being expended to regulate in this area.

Goldman Sachs' additional argument that there could be no fiduciary duty in this case because eToys and Goldman Sachs functioned as a typical seller and buyer is also unavailing. Generally, a buyer purchases a seller's goods at a wholesale price and attempts to resell those goods at the highest possible profit. Such a transaction would negate any fiduciary duty concerning pricing advice as no rational seller would place trust in a buyer's pricing given the parties' opposing interests. Here, in contrast, Goldman Sachs and eToys allegedly agreed to a fixed profit from the selling of the securities—Goldman Sachs was to receive about 7% of the offering proceeds. Thus eToys allegedly believed its interests and those of Goldman Sachs were aligned: the higher the price, the higher Goldman Sachs' 7% profit. Consequently, eToys allegedly had a further reason to trust that Goldman Sachs would act in eToys' interest when advising eToys on the IPO price.

Goldman Sachs warns that to find a fiduciary relationship in this case may have a significant impact on the underwriting industry. We think its concern is overstated. To the extent that underwriters function, among other things, as expert advisors to their clients on market conditions, a fiduciary duty may exist. We stress, however, that the fiduciary duty we recognize is limited to the underwriter's role as advisor. We do not suggest that underwriters are fiduciaries when they are engaged in

---

4. The underwriter's responsibility with regard to a registration statement is to provide full and adequate information to investors concerning the distribution of the securities and the issuing company (*see* Securities Act of 1933 § 7 [15 USC § 77g] [providing in part that any registration statement shall contain information and documents "necessary or appropriate in the public interest or for the protection of investors"]; *see also* Securities Act of 1933 schedule A [15 USC § 77aa] [schedule of information required in registration statement]; § 11 [15 USC § 77k] [establishing civil liability on account of false registration statement]).

activities other than rendering expert advice. When they do render such advice, the requirement to disclose to the issuers any material conflicts of interest that render the advice suspect should not burden them unduly.

Accepting the complaint's allegations as true, as the Court must at this stage, plaintiff has sufficiently stated a claim for breach of fiduciary duty. This holding is not at odds with the general rule that fiduciary obligations do not exist between commercial parties operating at arm's length—even sophisticated counseled parties—and we intend no damage to that principle. Under the complaint here, however, the parties are alleged to have created their own relationship of higher trust beyond that which arises from the underwriting agreement alone, which required Goldman Sachs to deal honestly with eToys and disclose its conflict of interest—the alleged profit-sharing arrangement with prospective investors in the IPO.[5]

## III.

Moving next to plaintiff's other causes of action, we hold that the courts below properly dismissed the claim for breach of contract in the absence of an allegation that Goldman Sachs breached any provisions of the underwriting agreement. It is undisputed that Goldman Sachs fulfilled its commitments as set forth in the parties' contract, purchasing all of the available shares at a total of $178.4 million paid to eToys and reselling them to the public at the initial offering price of $20 per share.

Relatedly, plaintiff has also failed to plead a cause of action for breach of an implied covenant of good faith and fair dealing sufficient to survive dismissal under CPLR 3211. The complaint does not adequately allege that Goldman Sachs injured eToys' right to receive the benefits of their agreement (*see 511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144, 153 [2002]; *see also Dalton v Educational Testing Serv.*, 87 NY2d 384, 389-390 [1995]). As stated in the Prospectus, the principal purposes of the public offering were to increase work-

---

5. Other jurisdictions interpreting New York law have allowed similar pleadings to go forward and have held that the question of whether an underwriter had fiduciary obligations to the issuer of an IPO is a fact-specific determination to be made by the factfinder (*see Breakaway Solutions, Inc. v Morgan Stanley & Co. Inc.*, 2004 WL 1949300, 2004 Del Ch LEXIS 125 [Del Ct Ch, Aug. 27, 2004]; *Xpedior Creditor Trust v Credit Suisse First Boston [USA] Inc.*, 341 F Supp 2d 258 [US Dist Ct, SD NY 2004]; *MDCM Holdings, Inc. v Credit Suisse First Boston Corp.*, 216 F Supp 2d 251 [US Dist Ct, SD NY 2002]).

ing capital, to create a public market for the common stock, to facilitate future access to public markets, and to increase eToys' visibility in the retail marketplace. There is no dispute that the contractual objectives were achieved as a result of Goldman Sachs' underwriting services, and the complaint fails to allege otherwise.

Because this case arises from defendant's appeal, the issue with respect to plaintiff's fraud claim is limited to whether the courts below abused their discretion in granting plaintiff leave to replead. We find no abuse of discretion as plaintiff's allegations, if accompanied by sufficient detail, would be adequate to support a fraud claim at this juncture (*see Lama Holding Co. v Smith Barney*, 88 NY2d 413, 421 [1996]; *see also CPC Intl. v McKesson Corp.*, 70 NY2d 268, 285 [1987]).

█ Next is the cause of action for professional malpractice. The essence of plaintiff's allegations in this regard is that Goldman Sachs engaged in intentional misconduct by underpricing its shares, not that the investment firm acted negligently in failing to exercise a particular level of skill. Thus, we hold that the malpractice claim was properly dismissed as insufficiently pleaded and leave open the question whether a financial advisor or underwriter may ever be treated as a professional for purposes of such liability (*see Chase Scientific Research v NIA Group*, 96 NY2d 20, 29-30 [2001]).

█ Lastly, plaintiff fails to state a cause of action for unjust enrichment as the existence of a valid contract governing the subject matter generally precludes recovery in quasi contract for events arising out of the same subject matter (*see Clark-Fitzpatrick, Inc. v Long Is. R.R. Co.*, 70 NY2d 382, 388 [1987]).

Accordingly, the order of the Appellate Division should be modified, without costs, by dismissing the second, fourth and fifth causes of action and as so modified, affirmed. The certified question should be answered in the negative.

READ, J. (dissenting in part). The majority today holds that the lead managing underwriter in a firm commitment underwriting owes a fiduciary duty to the issuer to disclose conflicts of interest in connection with the pricing of securities. This new fiduciary obligation wars against our precedent and potentially conflicts with a highly complex regulatory framework designed to safeguard investors. I therefore respectfully dissent.

"Unless statutory language or public policy dictates otherwise,

the terms of a written agreement define the rights and obligations of the parties" (*Abiele Contr. v New York City School Constr. Auth.*, 91 NY2d 1, 9 [1997]). We have faithfully—that is, until today—declined to second-guess or interpolate unbargained-for provisions into contracts that are "the product of an arms-length transaction between sophisticated businessmen, ably represented" (*JMD Holding Corp. v Congress Fin. Corp.*, 4 NY3d 373, 382 [2005]; *see also South Rd. Assoc., LLC v International Bus. Machs. Corp.*, 4 NY3d 272, 277 [2005] [the "instrument was negotiated between sophisticated, counseled business people negotiating at arm's length" (quoting *Matter of Wallace v 600 Partners Co.*, 86 NY2d 543, 548 [1995] and *Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004])]; *Fiore v Oakwood Plaza Shopping Ctr.*, 78 NY2d 572, 581 [1991] ["Defendants were sophisticated parties involved in an arm's length commercial transaction . . . . The purchase price of the land alone was well in excess of $1 million, indicating the magnitude of the project. Furthermore, the parties were represented by counsel in negotiating the terms of the agreement"]; *Chimart Assoc. v Paul*, 66 NY2d 570, 574 [1986] ["the contract at issue is part of a multimillion dollar transaction involving sophisticated, counseled parties dealing at arm's length"]).

More particularly, we have—again, until today—refrained from injecting fiduciary obligations into sophisticated, counseled parties' arm's length commercial dealings. In refusing to fashion a "newly-notched fiduciary-like duty" for finders in *Northeast Gen. Corp. v Wellington Adv.* (82 NY2d 158, 161 [1993]), we remarked that "[i]f the parties find themselves or place themselves in the milieu of the 'workaday' mundane marketplace, and if they do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." (*Id.* at 162.)

Plaintiff, the committee of unsecured creditors of the bankrupt eToys, Inc., claims that Goldman, Sachs & Co., the lead managing underwriter of eToys' initial public offering (IPO),[1]

---

1. An IPO is the first public issuance of a stock from a company that has not previously been traded publicly. In a "hot" IPO, like eToys', the stock immediately trades at a premium in the aftermarket, the trading that takes place after termination of the price and trading restrictions governing the offering.

duped eToys into underpricing its stock at $20 a share.[2] Goldman allegedly carried out this deception so that it might profit from secret side deals with preferred customers who "were obligated to kick back to Goldman a portion of any profits that they made on after[ ]market sales of eToys['] securities allocated to them at the IPO."[3] While the pleading does not spell out exactly how underpricing worked in Goldman's favor, plaintiff's theory has to be that Goldman, whose underwriting compensation was a percentage (6.75%) of aggregate offering proceeds, stood to make more money on kickbacks from these secret side deals than it would have earned on its increased compensation from selling shares at some higher, theoretically "correct" price. Plaintiff further alleges that "[b]ased on communications with

---

**2.** "Underpricing" refers to the difference between the price at which stock is sold to the public in an IPO and the price in the aftermarket. That IPOs are underpriced is "as shocking a surprise as Claude Rains' discovery in 'Casablanca' that gambling was in progress at Rick's Café," since the "systematic underpricing of IPO shares is probably the most thoroughly documented empirical fact about IPOs" (Coffee, Corporate Securities, *The IPO Allocation Probe: Who Is the Victim?*, NYLJ, Jan. 18, 2001, at 5, col 1; *see generally* Ritter, *The Long-Run Performance of Initial Public Offerings*, 46 J Fin 3 [1991] [citing studies showing that IPOs produce 16.4% average positive initial return as measured from the offering price to the market price at the end of the first day of trading, and that extent of underpricing is highly cyclical, with much higher positive initial returns evident during "hot issue" markets; and, using a sample of 1,526 IPOs that went public in the United States in the 1975-1984 period, documenting third "anomaly," which is that in the long run IPOs appear to be overpriced]; *see also* Griffith, *Spinning and Underpricing: Legal and Economic Analysis of the Preferential Allocation of Shares in Initial Public Offerings*, 69 Brook L Rev 583, 590-630 [Winter 2004] [examining various theories to explain underpricing]). During the heyday of the Internet stock bubble, when eToys' public offering took place, very large "pops" in first-day IPO prices were commonplace, reaching a zenith (or nadir, depending upon your point of view) with the IPO of VA Linux Systems in December 1999. VA Linux—which, like eToys is now bankrupt—was priced at $30 a share, opened at $300 a share and closed at $242.375 a share, thus soaring 698% in opening day Nasdaq trading (*see* Fisher, *A Tiny Company Without Profits Goes Public With a Bang*, New York Times, Dec. 10, 1999; *see also* Baker, *Who Wants to Be a Millionaire? Law Firms Investing in Hot High-Tech IPOs Are Making a Fortune, But Some Critics Worry the Stock Craze is Clouding Ethics Matters*, 86 Feb ABA J 36 ["The fact that VA Linux hadn't turned a dime in profits and had no expectation of doing so did little to deter trading. Investors pushed the price upward on a gamble that the public would see the fledgling company . . . as a rival to Microsoft"]).

**3.** The practices alleged in the complaint are commonly referred to as "spinning" and "flipping." Spinning refers to the preferential allocation of the right to buy shares in an IPO, often to company managers or venture capitalists, who may quickly resell or "flip" these shares in the aftermarket for large profits.

Goldman, it was eToys' understanding that the offering price for eToys' common shares was to be set primarily by reference to then current market conditions and the anticipated demand for eToys' shares."

In allowing plaintiff's claim for breach of fiduciary duty to go forward, the majority disregards that eToys was a sophisticated, well-counseled business entity. eToys' major stockholders included important venture-capital and corporate investors; its largest single stockholder, Idealab, styles itself as an incubator for successful technology companies (*see* <http://www.idealab.com>, cached at <http://www.courts.state.ny.us/reporter/webdocs/idealab.htm>). eToys was represented by the Venture Law Group, P.C., which "specializes in representing high potential technology companies from before their creation through their public offering or acquisition and beyond," and which in 1999 handled "the fourth largest number of initial public offerings for technology companies in the country" (<http://www.venlaw.com/About>, cached at <http://www.courts.state.ny.us/reporter/webdocs/Venture_Law_Group.htm>).

Further, the offering price was a key term in the underwriting agreement, a purchase contract between eToys, the issuer/seller, and Goldman, the underwriter/buyer, who represented all the underwriters in the syndicate.[4] How may a buyer ever owe a duty of the highest trust and confidence to a seller regarding a negotiated purchase price? The interests of a buyer and seller are inevitably not the same. Indeed, it is a longstanding principle of contract law that a buyer may make a binding contract to buy something that it knows its seller undervalues (*Laidlaw v Organ*, 2 Wheat [15 US] 178 [1817]).

Here, eToys' prospectus acknowledged that the "initial public offering price for the common stock *has been negotiated* among eToys and the representatives of the underwriters" (emphasis added). Contrary to plaintiff's allegation, eToys also represented in the prospectus that the offering price was not driven by anticipated demand alone. The other factors that came into play were "eToys' historical performance, estimates of eToys' business potential and earnings prospects, an assessment of eToys' management and the consideration of the above factors in rela-

---

4. The syndicate was the ad hoc group of underwriters who banded together to underwrite—that is, purchase—from eToys, the issuer/seller, at a fixed price less the discount (6.75%) and to distribute eToys' new securities.

tion to market valuation of companies in related businesses." Further, eToys' prospectus identified four "principal purposes" for the IPO: to increase working capital, create a public market for its stock, facilitate future access to the public capital markets, and increase visibility in the retail marketplace. By selling only 8.2% of its outstanding common stock at $20 a share, eToys raised the capital called for by its business plan.

In short, the offering price was not "set" by Goldman, it was negotiated by sophisticated, represented parties—the issuer/seller and the underwriter/buyer; the offering price was negotiated with reference to more than "then current market conditions" and "anticipated demand"; and eToys did not seek to negotiate an offering price solely to maximize the proceeds raised in the offering. Documentary evidence in the record confirms all these points, and the nature of the contractual relationship between an issuer and an underwriter is long-established and well-understood (*see United States v Morgan*, 118 F Supp 621, 635-655 [SD NY 1953]). While plaintiffs may have alleged "an advisory relationship that was independent of the underwriting agreement" (majority op at 20), conclusory allegations are insufficient to survive a motion to dismiss (*see e.g. Caniglia v Chicago Tribune-N.Y. News Syndicate*, 204 AD2d 233, 233-234 [1st Dept 1994] [on motion to dismiss, facts pleaded are presumed to be true and accorded every favorable inference, but "allegations consisting of bare legal conclusions, as well as factual claims inherently incredible or flatly contradicted by documentary evidence are not entitled to such consideration"]).

Finally, I am less sanguine than the majority about the consequences of recognizing "a fiduciary duty . . . requiring disclosure of [a lead underwriter's] compensation arrangements with its customers" (majority op at 20). The excesses of the market in the days of the Internet high-tech mania did not go unnoticed by regulators. In addition to a flurry of enforcement actions at the state and federal levels, the Securities and Exchange Commission (SEC) in 2002 asked the two major self-regulatory organizations (SROs),[5] the New York Stock Exchange, Inc. (NYSE) and the National Association of Securities Dealers,

---

5. SROs are quasi-governmental entities with "a duty to promulgate and enforce rules governing the conduct of [their] members" (*Barbara v New York Stock Exch., Inc.*, 99 F3d 49, 51 [2d Cir 1996]; *see* 15 USC § 78c [a] [26]; § 78f [b]; § 78s [g]). The SEC must approve or reject any rule, practice, policy or interpretation proposed by an SRO (*see* 15 USC § 78s [b]; *Barbara*, 99 F3d at 51

Inc. (NASD), to convene a high-level group of business and academic leaders to review the IPO process in light of the experience of the 1990's, and to recommend ways to cure the problems exposed during that period and to improve the underwriting process going forward. This group produced a report in May 2003 (*see* NYSE/NASD IPO Advisory Committee, Report and Recommendations of a committee convened by the New York Stock Exchange, Inc. and NASD at the request of the US Securities and Exchange Commission [May 2003], published on the Internet at <http://www.nasd.com/web/groups/rules_regs/documents/rules_regs/nasdw_010373.pdf>, cached at <http://www.courts.state.ny.us/reporter/webdocs/nasdw_010373.pdf>), directly leading, among other things, to pending proposed NYSE rule 470 and NASD rule 2712 (*see* 69 Fed Reg 77,804 [Dec. 28, 2004]; *see also* 70 Fed Reg 19,672 [Apr. 13, 2005]). These rather complicated proposed rules govern allocations and distributions of shares in IPOs.[6] How our new fiduciary duty for underwrit-

---

[describing the role of SROs in enforcement of federal securities laws and SRO rules or regulations]).

**6.** Specifically, the proposed rules would (1) prohibit IPO allocations as a consideration or inducement for the receipt of compensation that is excessive in relation to the services provided by the member or member organization (so-called "quid pro quo" allocations); (2) prohibit the awarding of IPO shares to executive officers and directors and their household members of issuers that have, or will have, an investment banking relationship with the member or member organization on the condition that such officers and directors, on behalf of the issuer, direct future investment banking business to the member or member organization (i.e., spinning); (3) prohibit the imposition of a flipping penalty (a "penalty bid") on associated persons whose customers flipped IPO shares unless such penalty is imposed on the entire underwriting syndicate; and (4) require the book-running lead manager, who is responsible for assembling pre-price indications of interest in an underwritten transaction, to provide the issuer's pricing committee (or, if the issuer has no pricing committee, its board of directors) with (a) a regular report of indications of interest, including the names of interested institutional investors and the number of shares indicated by each, and a report of aggregate demand from retail investors (which the SROs characterized as conforming the rules to existing practices); and (b) a report on final allocations within a reasonable time after the IPO's settlement date. These proposed rules would also extend lock-up agreements (i.e., formal restrictions on resale of securities) to officers' and directors' issuer-directed shares (e.g., so-called "friends and family" programs) and require the book-running lead manager to notify the issuer and the public (through a major news service) at least two days prior to the release or waiver of any lock-up or other restriction on the transfer of the issuer's shares; specify how the book-running lead manager and other syndicate members must deal with returned shares; and prohibit members from accepting market orders to purchase IPO shares in the aftermarket for one trading day following an IPO (*see also* 69 Fed Reg, at 77,813-77,814 [discussing three

ers may fit into or conflict with the developing regulatory scheme is impossible to predict. We have, however, at the very least introduced uncertainty into a complex subject of enormous importance to investors. This subject is, in my view, better dealt with by specialized regulators than by the evolving common law.

Chief Judge KAYE and Judges G.B. SMITH, ROSENBLATT, GRAFFEO and R.S. SMITH concur with Judge CIPARICK; Judge READ dissents in part in a separate opinion.

Order modified, etc.

---

possible new approaches for regulating unseasoned issuers, whose stocks experienced dramatic run-ups and declines in price during the late 1990's and 2000, and the factors, both objective and subjective, that bear upon establishing an offering price]).