[973 NE2d 735, 950 NYS2d 325]

ODDO ASSET MANAGEMENT, Appellant, v BARCLAYS BANK PLC et al., Respondents, et al., Defendants.

Argued May 30, 2012; decided June 27, 2012

**POINTS OF COUNSEL**

*Grant & Eisenhofer P.A.*, New York City (*Geoffrey C. Jarvis, Jay W. Eisenhofer, Deborah A. Elman* and *David M. Haendler* of counsel), for appellant. I. The Appellate Division erred in finding, on a pre-answer motion, that the managers of the SIV-Lites

did not owe a fiduciary duty to Oddo Asset Management. (*Sergeants Benevolent Assn. Annuity Fund v Renck*, 19 AD3d 107; *Wiener v Lazard Freres & Co.*, 241 AD2d 114; *Bank of Am. Corp. v Lemgruber*, 385 F Supp 2d 200; *Mandelblatt v Devon Stores*, 132 AD2d 162; *EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11; *Anonymous v CVS Corp.*, 188 Misc 2d 616; *Bestolife Corp. v American Amicable Life*, 5 AD3d 211; *Frydman & Co. v Credit Suisse First Boston Corp.*, 272 AD2d 236; *Bernstein v Kelso & Co.*, 231 AD2d 314; *Bullmore v Ernst & Young Cayman Is.*, 45 AD3d 461.) II. The Appellate Division's conclusion that no contract was breached is legally and factually flawed. (*State St. Bank & Trust Co. v Inversiones Errazuriz Limitada*, 374 F3d 158; *511 W. 232nd Owners Corp. v Jennifer Realty Co.*, 98 NY2d 144; *Murphy v American Home Prods. Corp.*, 58 NY2d 293; *Richbell Info. Servs. v Jupiter Partners*, 309 AD2d 288; *Sorenson v Bridge Capital Corp.*, 52 AD3d 265, 12 NY3d 748; *Pernet v Peabody Eng'g Corp.*, 20 AD2d 781; *Dalton v Educational Testing Serv.*, 87 NY2d 384; *Lama Holding Co. v Smith Barney*, 88 NY2d 413; *Marks v Smith*, 65 AD3d 911; *Frydman & Co. v Credit Suisse First Boston Corp.*, 272 AD2d 236.)

*Linklaters LLP*, New York City (*Lance Croffoot-Suede, Sterling P.A. Darling, Jr.*, and *Katherine R. Ryan* of counsel), for Barclays Bank PLC and another, respondents. I. Oddo Asset Management's failure to plead breaches of its contracts with Golden Key Ltd. and Mainsail II Ltd. precludes its claims for tortious interference with contract. (*Lama Holding Co. v Smith Barney*, 88 NY2d 413; *New York Univ. v Continental Ins. Co.*, 87 NY2d 308; *Jack L. Inselman & Co. v FNB Fin. Co.*, 41 NY2d 1078; *Rosen Assoc. Mgt. Corp. v Bruckner Plaza Assoc.*, 294 AD2d 556; *Dalton v Educational Testing Serv.*, 87 NY2d 384; *Amcan Holdings, Inc. v Canadian Imperial Bank of Commerce*, 70 AD3d 423; *Pernet v Peabody Eng'g Corp.*, 20 AD2d 781; *Pramer S.C.A. v Abaplus Intl. Corp.*, 76 AD3d 89; *Accurate Copy Serv. of Am., Inc. v Fisk Bldg. Assoc. L.L.C.*, 72 AD3d 456; *Murphy v American Home Prods. Corp.*, 58 NY2d 293.) II. The Commercial Division's use of the term "sophisticated" and its description of Oddo Asset Management as a creditor is not error. (*Wachovia Sec., LLC v Joseph*, 56 AD3d 269; *Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V.*, 76 AD3d 310, 17 NY3d 269; *Arfa v Zamir*, 76 AD3d 56, 17 NY3d 737; *RNK Capital LLC v Natsource LLC*, 76 AD3d 840; *Ark Bryant Park Corp. v Bryant Park Restoration Corp.*, 285 AD2d 143.)

*Cahill Gordon & Reindel LLP*, New York City (*Dean Ringel, Floyd Abrams* and *Victor Suthammanont* of counsel), for McGraw-Hill Companies, Inc., respondent. I. The Appellate Division correctly determined that plaintiff failed to state a cause of action for aiding and abetting a breach of a fiduciary duty. (*Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158; *Meinhard v Salmon*, 249 NY 458; *Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553; *Marmelstein v Kehillat New Hempstead: The Rav Aron Jofen Community Synagogue*, 45 AD3d 33; *United States v Chestman*, 947 F2d 551; *Dobroshi v Bank of Am., N.A.*, 65 AD3d 882; *AJW Partners LLC v Itronics Inc.*, 68 AD3d 567; *WIT Holding Corp. v Klein*, 282 AD2d 527; *Mandarin Trading Ltd. v Wildenstein*, 16 NY3d 173; *SNS Bank v Citibank*, 7 AD3d 352.) II. Plaintiff failed to allege McGraw-Hill's knowing participation or substantial assistance in any breach of fiduciary duty or that McGraw-Hill's acts proximately caused plaintiff's damages. (*Kaufman v Cohen*, 307 AD2d 113; *Bullmore v Ernst & Young Cayman Is.*, 45 AD3d 461; *Roni LLC v Arfa*, 15 NY3d 826; *Global Mins. & Metals Corp. v Holme*, 35 AD3d 93; *Mazzaro de Abreu v Bank of Am. Corp.*, 525 F Supp 2d 381; *Harlow v Fitzgerald*, 457 US 800; *Gall v Summit, Rovins & Feldesman*, 222 AD2d 225.)

## OPINION OF THE COURT

Chief Judge LIPPMAN.

Following the collapse of two investment vehicles, known as SIV-Lites, Oddo Asset Management (Oddo) commenced this action against Barclays Bank PLC, Barclays Capital Inc. (collectively, Barclays), and the McGraw-Hill Companies, Inc. (parent company of Standard & Poor's) claiming aiding and abetting breach of fiduciary duty and tortious interference with contract. For the reasons that follow, we conclude that the collateral managers appointed to oversee the assets of the SIV-Lites did not owe a fiduciary duty to plaintiff, and plaintiff failed to state a cognizable claim for tortious interference with contract. We therefore affirm the Appellate Division order upholding the dismissal of the complaint.

## I.

Plaintiff Oddo Asset Management, a leading French asset management company with over 350 institutional clients and

investments of €16.6 billion,[1] purchased $30 million in Golden Key Ltd. (Golden Key) AAA-rated and AA-rated mezzanine notes from Barclays in 2005 and 2006 and $20 million in AAA-rated mezzanine notes in Mainsail II (Mainsail) from Barclays in July 2006. Golden Key and Mainsail were SIV-Lites, a type of structured investment vehicle that borrowed money and raised equity to purchase asset-backed securities. The SIV-Lites borrowed money by issuing commercial paper, mezzanine notes, and capital notes. Commercial paper (essentially short-term promissory notes) comprised about 90% of the funding for Golden Key and Mainsail and was senior in terms of priority of distributions. Commercial paper holders were paid a fixed rate of return and their entire principal was to be repaid upon maturity, in 90 days. When the commercial paper notes matured, the SIV-Lites were required to raise fresh funds in a process known as "rolling over" their commercial paper. The mezzanine notes had a four- or five-year term of maturity and also paid a set rate of return, and the principal was to be returned upon maturity. The capital notes had a later maturity date than the mezzanine notes and would be the first to absorb losses related to declines in the SIV-Lites' asset value. The SIV-Lite business model was to generate a higher rate of return from its asset-backed securities, which were comprised primarily of residential mortgage-backed securities (RMBS) and commercial mortgage-backed securities (CMBS), than the interest the SIV-Lite had to pay the holders of the commercial paper, mezzanine notes, and capital notes.[2] The profits of the SIV-Lites were split between the capital noteholders and the collateral managers.

Defendant Barclays arranged the creation of Golden Key and Mainsail by incorporating the SIV-Lites as limited liability entities in the Cayman Islands. Barclays also determined the size and leverage of the SIV-Lites and prepared the information memoranda describing the SIV-Lites and the notes to be issued.

---

1. Oddo's asset portfolio was €16.6 billion as of the end of 2006.
2. While structured investment vehicles (SIVs) invested in a variety of asset classes such as mortgages, credit cards, auto loans, and subordinated bank debt and had no termination date, SIV-Lites mainly invested in RMBS and had a limited duration. SIV-Lites also had defined reinvestment strategies and reduced funding costs, but were riskier because they had large asset concentrations in a particular class (O'Leary, *The Seductive Qualities of SIVs*, 1 Am Securitization J [No. 2] 22, 24-26 [2007]).

Barclays warehoused asset-backed securities[3] for purchase and provided loans in the event of a liquidity shortage.[4]

Barclays also selected the collateral managers of Golden Key and Mainsail. Nonparty Avendis Financial Services Limited (Avendis) and defendant Solent Capital (Jersey) Limited (Solent) were appointed as collateral managers to invest and manage the proceeds raised from the issuance of notes in Golden Key and Mainsail, respectively. The collateral managers were responsible for ensuring that the investment portfolio satisfied "Specific Investment Eligibility Criteria" and maintained a certain credit quality. For instance, instruments acquired by Golden Key were required to have a minimum public rating of at least AA- by Standard & Poor's (S&P) at the time of acquisition. The collateral managers were also responsible for making trades, reinvesting principal proceeds from maturing assets, and maximizing recovery rates when defaults on the SIV-Lite's asset pool occurred. In their management agreements, Solent and Avendis agreed to perform their responsibilities with "reasonable care, in good faith and in a manner generally consistent with . . . [the] standard of care and degree of skill . . . exercised by[ ] institutional managers of international standing." The collateral managers sent weekly reports to the ratings agencies regarding the status of the investments. Periodic valuation

---

3. SIV-Lites entered into warehousing transactions because, prior to issuing their notes, they did not have the capital necessary to purchase investments to generate returns used to make interest payments to the noteholders. Golden Key and Mainsail entered into credit agreements with Barclays, and Barclays agreed to purchase specific asset-backed securities and hold them for eventual sale or transfer to Golden Key or Mainsail, once they sold their notes. The warehousing provision of the information memoranda provided,

> "the Warehousing Party [Barclays] has agreed to acquire specified Investments for the Issuer [Golden Key and Mainsail] . . . and hold them for purchase by, or transfer to, the Issuer. The Issuer will . . . purchase . . . the Warehousing Investments; *provided*, that the Issuer will not purchase or take delivery of any Warehousing Investment that at the time of purchase or delivery by it is not an Eligible Investment."

The SIV-Lites agreed to pay Barclays' purchase price for the warehoused investments.

4. Unlike traditionally supported asset-backed commercial paper conduits, SIVs and SIV-Lites had limited liquidity support. They did not have access to full liquidity support from a highly rated financial institution, and their liquidity was totally dependent on their continued ability to issue new notes and on the market value of their assets (*see* Borgman, *Prudent Investing? The Credit Crisis of August 2007, Mainsail II SIV-Lite, and the State Cash Investment Pool*, Amfiteatru Econ J, Special No. 3, at 645, 652 [2009]).

reports for the SIV-Lites were sent by the administrator, QSR Management, to the noteholders.

S&P (owned by defendant the McGraw-Hill Companies) evaluated the risk of default for the issued notes and rated Golden Key and Mainsail's "Tier 1" mezzanine notes AAA[5] and "Tier 2" mezzanine notes AA. A security trustee, the Bank of New York, was also appointed to represent the interests of note-holders and was granted a security interest in all of Golden Key's and Mainsail's assets, securing the mezzanine notes.[6]

According to Oddo, Avendis and Solent conspired with Barclays to transfer to Golden Key and Mainsail impaired sub-prime mortgage-backed securities at inflated prices. In July and August 2007, after obtaining the required noteholder consents[7] and ratings confirmations from S&P,[8] Golden Key increased its size by purchasing $574 million in warehoused sub-prime

---

**5.** A rating of AAA denotes high credit quality and is the same rating as those typically assigned to bonds backed by the full faith and credit of the United States Government, such as treasury bills.

**6.** The terms of Golden Key's information memorandum provided that if the market value of Golden Key's investment portfolio declined below 92% of the value of its total outstanding obligations, a mandatory acceleration event, or wind-down event, would occur. Golden Key's debt obligations would accelerate, and all responsibility for managing investments would be transferred from Avendis to the trustee, the Bank of New York. Golden Key would be placed in a "frozen" state, and a receiver would be appointed to pay creditors in order of seniority from the entity's remaining assets. Mainsail had similar provisions to guard against the structure taking on serious losses. The SIV-Lites had to pass a series of tests (e.g., capital wind-down test, commercial paper coverage test, leverage tests, market value coverage test) each business day in order to avoid a wind-down event. If interest was not paid on the commercial paper and mezzanine notes each month, that would constitute a wind-down event.

The information memoranda also provided that interest payments "will be payable solely from, and to the extent of, the available proceeds" from the asset-backed securities and from the proceeds of additional offered notes. The information memoranda further advised noteholders that they should be aware of the risks involved in investing in leveraged asset-backed securities and that the securities may be subordinate in right of payment to other securities, despite being highly rated by S&P.

**7.** Oddo never consented to the proposed expansion of Golden Key and even offered to sell its mezzanine notes to Barclays. Barclays agreed to purchase $7 million in AAA-rated mezzanine notes from Oddo. With consent from a sufficient number of noteholders, the increase in the size of Golden Key was approved.

**8.** S&P was asked to give its opinion on the creditworthiness of the SIV-Lites in light of the proposed increase in size of the SIV-Lites' assets and liabilities. S&P confirmed the AAA ratings for the mezzanine notes of both Golden Key and Mainsail in April 2007 and July 2007. S&P was not asked to

*(n. cont'd)*

mortgage-backed securities from Barclays at par, meaning at the price that Barclays paid for them. Upon transfer, Golden Key allegedly suffered an immediate loss of approximately $123 million, or 21% of the value transferred to Barclays. Likewise, Barclays sold $400 million in warehoused mortgage-backed securities to Mainsail in April 2007 and an additional $637 million in securities to Mainsail in July 2007. Mainsail purchased the securities at par, despite the fact that the securities had fallen significantly in value. The SIV-Lites were required to purchase at par according to their warehousing agreements with Barclays (*see* n 3, *supra*). Immediately after acquisition, Mainsail allegedly suffered a loss of $505 million. Oddo maintains that Barclays offloaded the sub-prime asset-backed securities onto the balance sheets of Golden Key and Mainsail in order to shift losses from Barclays to the SIV-Lites, knowing that the securities would plummet in value. Oddo claims that both Avendis and Solent acquiesced to the expansion because they did not want to jeopardize their relationships with Barclays. The collateral managers sought to be appointed as managers on future Barclays-arranged investment vehicles and were hoping to obtain a larger fee with an expanded investment portfolio, according to Oddo.

About 28 days after S&P had confirmed the AAA ratings of the mezzanine notes of both Golden Key and Mainsail in July 2007, S&P issued a report downgrading the ratings of both SIV-Lites by 17 notches, from AAA to CCC. Oddo alleges that S&P knew that Golden Key and Mainsail's investment portfolios were at serious risk of downgrade, even prior to the acquisition of the warehoused securities from Barclays. Oddo claims that S&P abandoned its professional standards by confirming Golden Key and Mainsail's AAA ratings prior to the expansion of the investment portfolios. S&P allegedly acted as it did because Barclays was an important repeat customer.

Because both Golden Key and Mainsail held assets that were worth significantly less than their liabilities, the SIV-Lites were unable to reborrow in the commercial paper market, which triggered mandatory acceleration events. The vehicles ultimately collapsed, and both Golden Key and Mainsail investors lost nearly all of their investments. Oddo allegedly lost a total of $43 million ($50 million minus the $7 million in notes that Barclays bought back).

---

perform a credit analysis of the specific investment assets to be acquired by the vehicles.

In July 2008, Oddo commenced this action against Barclays, S&P, and Solent.[9] Oddo asserts that Solent breached its fiduciary duty to the investors of Mainsail and Avendis breached its fiduciary duty to the investors of Golden Key, and that Barclays and S&P aided and abetted these breaches. Oddo claims Avendis and Solent conspired with Barclays to transfer the mortgage-backed securities to the SIV-Lites even though Barclays knew that the securities were toxic. S&P was allegedly complicit in the collateral managers' breach of fiduciary duty by issuing favorable ratings for the various notes issued by Golden Key and Mainsail, despite knowing that they were at risk of a downgrade. Oddo also claims that Barclays tortiously interfered with Oddo's contract with Golden Key and Mainsail.[10]

Defendants moved to dismiss the complaint for lack of personal jurisdiction against Solent and for failure to state a cause of action, arguing that neither Avendis nor Solent owed a fiduciary duty to plaintiff under applicable law. Barclays argued that Oddo failed to state a claim for tortious interference because it did not allege an underlying breach of the mezzanine notes. Supreme Court dismissed the claims against Solent for lack of personal jurisdiction and also dismissed all claims against Barclays and S&P (36 Misc 3d 1205[A], 2010 NY Slip Op 52449[U] [2010]). Plaintiff appealed as to Barclays and S&P, and the Appellate Division affirmed, holding that "[t]he causes of action for aiding and abetting a breach of fiduciary duty fail[ed] to allege that the collateral managers of the [SIV-Lites] had any contact or relationship with plaintiff such as would give rise to an underlying fiduciary duty" (*Oddo Asset Mgt. v Barclays Bank PLC*, 84 AD3d 692, 693 [1st Dept 2011]). The Appellate Division further determined that plaintiff's tortious interference claim failed because Oddo did not allege an actual breach of the underlying contract (*id.*). We granted plaintiff's motion for leave to appeal (17 NY3d 713 [2011]), and now affirm.

## II.

In *Roni LLC v Arfa* (18 NY3d 846, 848 [2011]), we held that a "fiduciary relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit

---

9. In November 2007, Avendis ceased all operations and went into liquidation.

10. S&P is not a defendant on the tortious interference with contract claim.

of another upon matters within the scope of the relation" ([internal quotation marks omitted], quoting *EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). A fiduciary relationship is "necessarily fact-specific" and is also "grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions" (*EBC I*, 5 NY3d at 19). While a contractual relationship is not required for a fiduciary relationship, "if [the parties] do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them" (*Northeast Gen. Corp. v Wellington Adv.*, 82 NY2d 158, 162 [1993]; *see EBC I*, 5 NY3d at 20 [same]).

Foremost, there is generally "no fiduciary obligation in a contractual arm's length relationship between a debtor and a note-holding creditor" (*see AJW Partners LLC v Itronics Inc.*, 68 AD3d 567, 568 [1st Dept 2009]; *SNS Bank v Citibank*, 7 AD3d 352, 354 [1st Dept 2004]). A debtor and creditor have no special relationship of confidence and trust (*see Dobroshi v Bank of Am., N.A.*, 65 AD3d 882, 884 [1st Dept 2009], *lv dismissed* 14 NY3d 785 [2010]), and the relationship is generally controlled by contract. Oddo admits in the complaint that the mezzanine notes it held were a "form of debt." While the mezzanine notes did have some equity-like features in that noteholders could vote to remove the collateral managers, there is no factual basis to elevate Oddo's rights to those of a shareholder. Shareholders of corporations hold the rights to have their assets managed honestly and prudently for the shareholders' benefit. However, Oddo did not own shares or a fractional interest in the two SIV-Lites (*see Yuko Ito v Suzuki*, 57 AD3d 205, 207-208 [1st Dept 2008]); it was essentially a lender. The holders of equity (also known as the capital noteholders) in Golden Key and Mainsail absorbed the first losses to the SIV-Lites and would share in the potential profits. On the other hand, Oddo, a mezzanine noteholder, received a fixed rate of return and was to have its principal returned upon maturity. Even though the nature of the SIV-Lites was unique, the facts alleged in the complaint are insufficient to accord Oddo a status equivalent to a shareholder of Golden Key and Mainsail. While the collateral managers may have owed fiduciary and contractual duties to the SIV-Lites, there is no factual basis to create fiduciary duties running from the managers to the mezzanine noteholders. It is the receivers for the SIV-Lites who can bring claims for breach of fiduciary

duty and breach of the management agreements against entities such as Solent, Barclays, and S&P.

There are additional reasons to conclude that the collateral managers did not owe a fiduciary duty to Oddo. Oddo had no contractual relationship with Avendis and Solent[11] and no direct dealings with them. While Oddo argues that it received monthly investment reports from Avendis and Solent, the complaint provides that the administrator, QSR Management Limited, was the entity that sent noteholders periodic valuation reports. The complaint never alleged any direct communications between plaintiff and the collateral managers, and consequently, there is insufficient factual basis to establish a relationship of higher trust between Oddo and Avendis and Solent.

Therefore, affording every favorable inference to plaintiff and taking the allegations of the complaint as true (see EBC I, 5 NY3d at 19), we hold that plaintiff failed to allege facts giving rise to a fiduciary duty owed to it, and therefore S&P and Barclays cannot be liable for aiding and abetting a breach of such fiduciary duty.

## III.

Plaintiff also alleges that Barclays tortiously interfered with plaintiff's contracts with Golden Key and Mainsail. In order to make a claim for tortious interference, plaintiff must plead the existence of a valid contract between the plaintiff and the SIV-Lites, Barclays' knowledge of that contract, and Barclays' intentional procurement of Golden Key's and Mainsail's breach of the contract without justification, actual breach of the contract, and Oddo's damages resulting from the breach (see Lama Holding Co. v Smith Barney, 88 NY2d 413, 424 [1996]). Oddo claims that Golden Key and Mainsail breached their contractual obligations by "acquiring the warehoused securities . . . [which] devalued the investors' security interest in [the SIV-Lites'] investment portfolio and damaged [the SIV-Lites'] ability to pay interest" on the mezzanine notes (complaint ¶¶ 182, 199).

However, Golden Key and Mainsail never breached their contractual obligations to Oddo when expanding the size of

---

11. Oddo's purchases of the mezzanine notes was documented by a contract with the SIV-Lites, though Oddo had no contractual relationships with collateral managers, Avendis and Solent. The notes and corresponding offering documents explicitly stated that "in connection with the purchase of the mezzanine notes," the collateral manager was not "acting as a fiduciary or financial or investment adviser for the holder."

their investment portfolios and acquiring the additional securities. Barclays properly obtained the required noteholder consents to expand Golden Key. Barclays, Avendis, and Solent also obtained confirmations from S&P of the ratings for the commercial paper and mezzanine notes prior to the acquisition of the warehoused securities. The warehousing provision in the contracts provided that the SIV-Lites would pay the warehouser's (Barclays') purchase price for the securities, despite any fluctuations in the market price. The risk of a shift in the market price of the warehoused securities was included in the information memoranda and known to Oddo at the time it purchased the mezzanine notes. As such, the expansion of the SIV-Lites' investment portfolio and the acquisition of the warehoused securities did not breach any express term in Oddo's contracts with Golden Key and Mainsail.[12]

Moreover, Oddo's claim for inducing breach of an implied covenant of good faith and fair dealing also fails. The bad faith and unfair dealing alleged in the complaint is not that of the SIV-Lites, who were themselves victims of the alleged scheme, but of Barclays and their managers, with which Oddo had no contract.[13] Since there was no underlying breach of contract, Oddo's tortious interference claim against Barclays also fails.

## IV.

The present case demonstrates how the utility of SIV-Lites themselves was undermined by the collapse of the housing boom in 2007 and 2008,[14] which precipitated the credit crisis that decimated global financial markets. Prior to the demise of Golden Key and Mainsail, investors, rating agencies, and the arranging banks all wrongly assumed that credit markets would not dry up, and that the markets would always supply liquidity

---

12. Additionally, Oddo was explicitly warned in the information memoranda that it could lose its principal and interest payments if the underlying investments (i.e., the mortgage-backed securities) failed and the entities became insolvent. The terms of the mezzanine notes also notified Oddo that, following a wind-down event, Oddo would only receive its principal and interest payments after Golden Key and Mainsail satisfied their obligations to commercial paper holders.

13. Insofar as there were contractual duties between Avendis/Solent and the SIV-Lites, plaintiff can obtain no benefit because the management agreements disclaimed any implied third-party beneficiary status.

14. *See* Davies and Sakoui, *Sigma Collapse Marks End of SIV Era*, Financial Times, Oct. 1, 2008.

and provide a constant stream of funding.[15] In hindsight, it is apparent that a greater degree of vigilance was necessary from all concerned before soliciting funds for, committing funds to, and rating esoteric entities with little understood risks, such as the SIV-Lites—whose fate was dependent almost exclusively on sub-prime residential and commercial mortgage-backed securities. That being said, Oddo has nevertheless failed to state a claim for aiding and abetting breach of fiduciary duty and tortious interference with contract, although remedies may be available to the receivers for the SIV-Lites.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order affirmed, with costs.

---

**15.** *See* Jickling, *Averting Financial Crisis*, Congressional Research Service Report for Congress, at CRS-5 (Mar. 21, 2008).